Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us.  Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 26, 2016

**2016 CO 64**

**No. 14SC77, <u>Pulte Home Corp. v. Countryside Cmty. Ass'n, Inc.</u>—Colorado Common Interest Ownership Act—Creation, Alteration, and Termination of Common Interest Communities—Management of the Common Interest Community.**

The supreme court addresses when and how common interest communities are formed under the Colorado Common Interest Ownership Act ("CCIOA"), §§ 38-33.3-101 to -402, C.R.S. (2016).  In particular, the court analyzes whether the declarant developer is liable for past-due assessments for maintenance of the developer's unsold properties and related common elements.  The supreme court concludes that, on the facts presented, the developer's recordation of the covenants and plat did not create a common interest community.  Rather, the community was created when the developer first subjected property to the covenants, and the remaining property could not become part of the community until the developer added it in accordance with certain prescribed steps.  The developer's property was therefore not part of the community and was not subject to assessments.  The supreme court also concludes the association has no remedy for unjust enrichment because its covenants fully allocate responsibility for assessment costs.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2016 CO 64

### Supreme Court Case No. 14SC77
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 12CA1568

### Petitioner/Cross-Respondent:

Pulte Home Corporation, Inc., a Michigan corporation,

v.

### Respondent/Cross-Petitioner:

Countryside Community Association, Inc., a Colorado nonprofit corporation.

### Judgment Reversed in Part and Affirmed in Part
*en banc*
September 26, 2016

**Attorneys for Petitioner/Cross-Respondent:**
Fox Rothschild LLP
Christopher J. Dawes
Christopher T. Groen
Risa B. Brown
Dominic H. Rivers
  *Denver, Colorado*

**Attorneys for Respondent/Cross-Petitioner:**
The Witt Law Firm
Jesse Howard Witt
  *Boulder, Colorado*

Miller Kabler P.C.
Milo D. Miller
  *Denver, Colorado*

**Attorneys for Amicus Curiae The Community Associations Institute:**
Jerry Orten
Christopher M. Drake
  *Denver, Colorado*

**Attorneys for Amicus Curiae The Home Builders Association of Metropolitan Denver:**
Dufford & Brown, P.C.
Randall J. Feuerstein
Christian D. Hammond
 *Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE COATS** concurs in part and concurs in the judgment, and **JUSTICE EID** and **JUSTICE MÁRQUEZ** join in the concurrence in part and concurrence in the judgment.

¶1 In this case, we address when and how common interest communities are formed under the Colorado Common Interest Ownership Act ("CCIOA" or "the Act"), §§ 38-33.3-101 to -402, C.R.S. (2016).

¶2 The Countryside Townhome Subdivision is a residential common interest community located in Fountain, Colorado. In 2011, the homeowners association for the Countryside Subdivision filed a complaint against the Countryside Subdivision's developer seeking over $400,000 in past-due assessments for maintenance of the developer's unsold properties and related common elements. The developer's liability turns on when its properties became a part of the Countryside Subdivision under the community's governing instruments and CCIOA.

¶3 In a split decision, the court of appeals determined that the community was formed when the document containing the community's covenants and the plat for the community were recorded, and that the developer's properties were brought into the community at that time. As a result, the court concluded that the developer was liable for the assessments under both the community's covenants and CCIOA.

¶4 We disagree. On the facts of this case, we conclude that recordation of the covenants and plat did not create a common interest community. Rather, the community was created when the developer first subjected property to the covenants, and the remaining property could not become part of the community until the developer added it in accordance with certain prescribed steps. Because the developer's property could not become part of the community until it was added, and the developer was not otherwise liable for the assessments, we reverse the court of appeals' judgment

3

deeming the developer contractually and statutorily liable to the homeowners association.

¶5 The court of appeals also held that, because the covenants fully allocate responsibility for assessment costs, the association has no remedy for unjust enrichment. We agree and therefore affirm that aspect of the court's decision.

## I. Facts and Procedural History

¶6 Pulte Home Corporation, Inc. ("Pulte") began creating the Countryside Subdivision as a statutory common interest community in March 2004, when it recorded the Declaration of Covenants, Conditions and Restrictions of Countryside Community Association ("CCR"). Pulte is the "Declarant" of the CCR. At that time, Pulte did not own any of the land that would eventually constitute the community, but it did have an option to purchase that land.

¶7 The CCR defines the "Community" as "real property described on Exhibit A or which becomes subject to this [CCR]," and encumbers "the real property described on . . . Exhibit A" with various "covenants, conditions, restrictions, [and] obligations," including a duty to pay assessments levied by the homeowners association, Countryside Community Association, Inc. ("the Association"). Exhibit A, however, lists no real property.

¶8 Exhibit D, on the other hand, contains a metes and bounds description of "Annexable Property," and article XII, section 5 of the CCR—entitled "Annexation"— outlines procedures by which the property described in Exhibit D could be subjected to the CCR's terms and incorporated into the community. Exhibit D further provides that,

4

upon recording of a plat, the annexable property "shall be known as . . . Lots 1 through 186 inclusive, Tracts B and C, Countryside Townhome Subdivision, Filing No. 1, County of El Paso, State of Colorado."

¶9 Tracts B and C are identified in Exhibit B as common elements. The CCR defines common elements as "any real property . . . owned or leased by the Association, other than a Lot . . . , for the benefit, use or enjoyment of the Owners." Common elements generally include roads, paths, and common spaces, such as a clubhouse. The 186 lots represent the maximum number of lots that may be included in the community, but the CCR makes clear that the actual number of lots included might be less.

¶10 In addition, the CCR states that Pulte, as the declarant, would pay all "Common Expenses" until the Association began annual assessments. The CCR defines common expenses as "expenditures made or liabilities incurred by or on behalf of the Association, together with any allocations to reserves." Once the Association made its first annual assessment, the Association would assume the responsibility to pay for common expenses and maintenance costs, but it could bill lot owners for their respective shares of those expenditures.

¶11 When Pulte created the Association, it appointed its own employees to serve as the Association's board of directors. Pulte's employees filled the board until June 2008, when homeowners replaced them.

¶12 In April 2004, one month after recording the CCR, the plat for the Countryside Subdivision, titled "Countryside Townhome Subdivision, Filing No. 1" ("the Plat"), was recorded. The Plat designated and numbered 186 lots, and identified Tracts B and C as

5

common areas. Together, the 186 lots and common areas comprise the same property as the annexable property described in Exhibit D.

¶13    In four separate transactions spanning from June 2004 to March 2006, Pulte exercised its option to purchase the land described in Exhibit D. In August 2004, Pulte conveyed Tracts B and C—the common elements—to the Association but retained easements over this land to maintain a sales office and access to other properties. Shortly thereafter, the Association began paying for services related to the common elements, such as irrigation, grounds maintenance, and snow removal. From 2005 to 2011, Pulte gradually constructed homes on the 186 lots and deeded the lots to various buyers. During this six-year period, the Association paid for maintenance of the structures built on the lots.

¶14    As of December 2010, Pulte still owned two of the 186 lots. The Association invoiced Pulte for its share of maintenance costs for these two properties, which amounted to $200. Pulte refused to pay.

¶15    In June 2011, the Association filed a complaint against Pulte seeking payment for this invoice and for Pulte's past-due share of assessments covering maintenance costs that the Association paid while Pulte still owned and was developing the lots described in Exhibit D. The Association alleged that Pulte owed over $400,000. The Association pleaded three claims: (1) breach of contract, arguing that the CCR required Pulte to pay assessments; (2) unjust enrichment, on the ground that Pulte would be unjustly enriched if allowed to retain the benefit of the Association's expenditures without cost;

and (3) breach of fiduciary duty, alleging that Pulte's employees had misappropriated funds while serving as the Association's board of directors.

¶16 After discovery, Pulte moved for summary judgment on all claims. Pulte argued that its properties were not annexed into the Countryside Subdivision until Pulte deeded them to third-party homebuyers and that, accordingly, the properties were not subject to assessments under the CCR while Pulte owned them. In opposition, the Association maintained that Pulte's properties were a part of the community and that the CCR required Pulte to pay assessments. The Association further asserted that, even if the CCR did not impose this payment obligation, CCIOA did.

¶17 After hearing arguments, the trial court granted Pulte's motion in full. In the process, the trial court considered the Association's CCIOA-violation claim—despite Pulte's objection that the claim was inadequately pleaded—but ultimately rejected it. The Association appealed on all grounds.

¶18 In a divided decision, the court of appeals affirmed in part and reversed in part. Countryside Cmty. Ass'n, Inc. v. Pulte Home Corp., Inc., No. 12CA1568, slip op. at 1 (Colo. App. Dec. 12, 2013). The court first determined that, under the CCR and CCIOA, recordation of the CCR and the Plat created the common interest community and that all of Pulte's property was included in the community at that time, not when Pulte deeded it piecemeal to third parties. See id. at 8–15. Based on this decision, the court further concluded that Pulte was liable for assessments under the CCR and the Act. Id. at 15–18. It therefore reversed the trial court's rulings on the breach of contract claim and the alleged statutory violation.

7

¶19 The court also reversed the grant of summary judgment on the breach of fiduciary duty claim, finding, under the doctrine of respondeat superior, that Pulte could be liable for its employees' breaches of their fiduciary duties. Id. at 20–23. However, the court affirmed the grant of summary judgment on the unjust enrichment claim, finding that the CCR covered the parties' responsibilities for maintenance costs. Id. at 23–25.

¶20 Judge Carparelli concurred in part and dissented in part. Although he agreed with the majority's resolution of the fiduciary duty and unjust enrichment claims, see id. at 27 (Carparelli, J., concurring in part and dissenting in part), he thought neither the CCR nor CCIOA required Pulte to pay assessments, see id. at 27, 40–43. He concluded that Pulte's property could not become a part of the community until it was annexed in compliance with the CCR, which meant that Pulte needed to record a deed conveying a portion of its property to a third party in addition to recording the CCR and the Plat. See id. at 29–40. In Judge Carparelli's view, the majority's rationale and conclusion rendered significant aspects of the CCR meaningless.

¶21 Pulte petitioned this court to review its contractual and statutory liability for assessments, and the Association cross-petitioned for review of its entitlement to bring an unjust enrichment claim. We granted certiorari as to both issues.[1]

---

[1] Specifically, we agreed to review the following issues:

1. Whether the majority of the court of appeals erred by concluding that a common interest community is formed immediately upon a developer's recording of a declaration and plat, rendering the developer immediately liable for assessments, notwithstanding that (a) a declaration provides for the gradual annexation

8

## II. Standard of Review

¶22 We review the grant of summary judgment de novo. W. Elk Ranch, L.L.C. v. United States, 65 P.3d 479, 481 (Colo. 2002). Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.

¶23 We also review de novo the interpretation of covenants and other recorded instruments. Ryan Ranch Cmty. Ass'n v. Kelley, 2016 CO 65, ¶ 24, __ P.3d __. In doing so, we give words and phrases their common meanings and will enforce such documents as written if their meaning is clear. See B.B. & C. P'ship v. Edelweiss Condo. Ass'n, 218 P.3d 310, 315 (Colo. 2009). Like contracts, we construe them as a whole, "seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." See Copper Mountain, Inc. v. Indus. Sys., Inc., 208 P.3d 692, 697 (Colo. 2009) (internal quotation marks omitted).

¶24 Finally, we review questions of statutory interpretation de novo as well. Robinson v. Legro, 2014 CO 40, ¶ 10, 325 P.3d 1053, 1056. In interpreting a statute, we look to "the entire statutory scheme to give consistent, harmonious, and sensible effect to all parts" and apply "words and phrases according to their plain and ordinary meaning." Denver Post Corp. v. Ritter, 255 P.3d 1083, 1089 (Colo. 2011). Where the statute's language is clear, we apply it as written. Id.

---

process that has long been practiced across Colorado, and (b) the developer clearly intended such gradual annexation.

2. Whether the court of appeals erred by affirming a grant of summary judgment on the association's equitable claim for unjust enrichment to the extent the community's declaration does not provide a remedy at law.

9

### III. Analysis

¶25    We begin our analysis by examining the formation of the Countryside Subdivision under the CCR and CCIOA.  In doing so, we address for the first time important questions concerning when and how common interest communities are created in Colorado.  Once we have discerned how the community was formed and, specifically, whether Pulte's properties became a part of it at its inception, we consider Pulte's liability for assessments under the CCR and the Act, respectively.

¶26    We turn last to the Association's unjust enrichment claim and consider whether the court of appeals properly rejected that claim as a matter of law.

### A.  Formation of the Countryside Subdivision

¶27    Pulte argues the court of appeals erred in determining that, under both the CCR and the Act, recordation of the CCR and the Plat formed a common interest community that included all of Pulte's property.  We agree.[2]

¶28    We first examine the formation of the community under the terms of the CCR.  Because article XII, section 4 of the CCR and section 38-33.3-104 of CCIOA provide that the statute prevails in the event of any conflict between the two sources, we then consider whether the CCR's formation framework comports with CCIOA.

---

[2] In its discussion of community formation, the court of appeals conflated two events: the creation, or legal inception, of a common interest community, and the incorporation of all platted land into that community.  It viewed these events as an inseparable single event of "formation," encompassing both.  However, while these two things can occur simultaneously, they need not.  We mention this at the outset to clarify that our ensuing discussion of community "formation" embraces both of these events and recognizes that they may occur independently.

## 1. Formation Under the CCR

¶29 The CCR limits the community to real property described in Exhibit A or real property that becomes subject to the CCR. Specifically, article I, section 11 of the CCR defines "Community" as:

> real property described on Exhibit A or which becomes subject to this [CCR], as supplemented and amended from time to time, with respect to which a Person, by virtue of such Person's ownership of a Lot, is obligated to pay for real property taxes, insurance premiums, maintenance or improvement of other real property described in this [CCR].

Exhibit A, in turn, begins with the phrase "The Community:" and, immediately below this phrase, states: "NONE AT THE TIME OF RECORDING THIS [CCR]." Read together, then, at the time the CCR was recorded, the community did not include any real property.

¶30 Article XII, section 5(a) of the CCR, however, sets forth three processes by which property may be "annexed" to the community. These three methods of annexation can fairly be described as (1) annexation by consent, (2) annexation by deed, and (3) annexation by form.

¶31 Annexation by consent is spelled out first and requires the approval of two-thirds of the Association's members. There is no evidence to suggest, and neither party alleges, that any land was annexed by consent.

¶32 Annexation by deed and annexation by form originate in that portion of section 5(a) which states that "the Declarant may annex to this [CCR] additional property

11

within the lands described on Exhibit D" for a period of up to seven years after the date on which the CCR was recorded.[3] Section 5(a) goes on to provide:

> Each such annexation shall be effected, if at all, by recording of a plat or map of the property to be annexed (unless such plat or map has previously been recorded), and by recording in the office of the Clerk and Recorder of the county in which the Community is located, one of the following: (i) a deed from Declarant that provides for conveyance of a portion of the property described in Exhibit D attached hereto to any Person, other than Declarant . . . ; or (ii) [a form entitled] Annexation of Additional Land . . . .

(Emphasis added.) Section 5(a) further states that all provisions of the CCR, "including, but not limited to, those provisions regarding obligations to pay assessments to the Association . . . , shall apply to annexed property immediately upon recording a deed, as aforesaid, or shall apply to the annexed property, as provided for in the recorded Annexation of Additional Land with respect thereto."

¶33    Because the clear language of these provisions refutes the court of appeals' view that the CCR "contemplate[s] that the common interest community would be formed upon the filing of the [CCR] and a map or plat," Countryside, slip op. at 13, we reject the court's interpretation of the CCR. See Buick v. Highland Meadow Estates, 21 P.3d 860, 862 (Colo. 2001) ("[We] will enforce a covenant as written that is clear on its face.").

¶34    As shown above, for there to be a "community," under the CCR's definition of that term, there needed to be (1) "real property described on Exhibit A" or (2) real property which became "subject to" the CCR. Since Exhibit A describes no real

---

[3] Exhibit D provides a metes and bounds description of the property that is "[a]nnexable" and also states: "Upon recording of a Plat, the above-described property shall be known as . . . Lots 1 through 186 inclusive, Tracts B and C, Countryside Townhome Subdivision, Filing No. 1, County of El Paso, State of Colorado."

12

property, the community could not be created until other real property was made subject to the CCR. Article XII, section 5(a), in turn, contains the procedures by which this could happen. In relevant part, that provision allows Pulte to incorporate into the community any of the property described in Exhibit D—and thereby subject that property to "[a]ll provisions" of the CCR—by taking two affirmative steps: (1) recording a plat of that property, and (2) recording either a deed conveying that property from Pulte to a third party or an "Annexation of Additional Land" form. Because recording the Plat could not, without a deed or form, render any property subject to the CCR, it could not, under the CCR's terms, create the community.

¶35 Contrary to the court of appeals majority's implication, Exhibit D's statement that "[u]pon recording of a Plat, the above-described property shall be known as . . . Lots 1 through 186 inclusive, Tracts B and C, Countryside Townhome Subdivision, Filing No. 1," (emphasis added), does not cut the other way. As Judge Carparelli recognized in dissent, this language does not say that, once a plat is recorded, the property in Exhibit D "shall be annexed into the community" or "shall form the community." See Countryside, slip op. at 32 (Carparelli, J., concurring in part and dissenting in part). Rather, the CCR stipulated that Pulte had to "annex" property before the community could exist.

¶36 If the majority below was correct that, according to the CCR's terms, recordation of the CCR and the Plat formed the community and brought within it all of the property described in Exhibit D, then the CCR's annexation provision would be pointless—why

13

require a plat <u>and</u> a deed or form if a plat is all it takes?[4]  Because the majority's interpretation undermines the clear structure of the CCR and would render significant aspects of it meaningless, we decline to follow that interpretation.  See <u>Copper Mountain</u>, 208 P.3d at 697.

¶37    In sum, as far as the CCR is concerned, Pulte's properties could not become a part of the Countryside Subdivision unless and until they were annexed in compliance with one of the processes set forth in article XII, section 5.  Because neither party contends that property was annexed by consent or by form, any CCR-compliant annexation could be accomplished only by recording a plat or map of the property <u>and</u> a deed conveying the property from Pulte to a third party.  It follows that the court of appeals erred as a matter of covenant interpretation in concluding that, under the CCR, Pulte's properties became a part of the community when the CCR and the Plat were recorded.

¶38    We now consider the separate question of community formation under CCIOA in order to determine whether the statute mandates a different result.

## 2.  Formation Under CCIOA

¶39    Section 38-33.3-201 of CCIOA governs the creation of common interest communities and states in part that "[a] common interest community may be created pursuant to this article <u>only by recording a declaration</u> executed in the same manner as a deed and, in a cooperative, by conveying the real estate subject to that declaration to

---

[4] We need not consider the majority's effort to impute an alternative meaning to article XII, section 5.  <u>See</u> <u>Countryside</u>, slip op. at 13–15.  The offered interpretation is contradicted by the CCR's plain terms.

14

the association." § 38-33.3-201(1) (emphasis added). It further explains that "[n]o common interest community is created until the plat or map for the common interest community is recorded." Id.

¶40 Based on this language, the court of appeals determined that "a common interest community is created by recording a declaration and a map or plat, not by selling units of the community to third persons." Countryside, slip op. at 11–12. The court also determined that once a declaration and plat are recorded, all of the platted property is made a part of the newly created community. See id. at 11–13, 15. Applying these determinations to the facts here, the court concluded that, under the Act, recordation of the CCR and the Plat created the Countryside Subdivision and that all of Pulte's 186 lots were a part of it from that point forward.

¶41 We see it differently. Although we agree with the general proposition that recording a declaration and a plat or map will typically create a common interest community under section 38-33.3-201, we conclude that the court of appeals misunderstood what constitutes a "declaration" within the meaning of the Act and, as a result, erred in determining that the CCR and Plat created the community here. We also reject the related notion that, once the community was created, all of the property shown on the Plat was automatically made a part of it.

¶42 The court of appeals assumed the CCR—or, the Declaration of Covenants, Conditions and Restrictions of Countryside Community Association—was the statutory declaration for the Countryside Subdivision. This type of "Declaration," however, is not synonymous with the term "declaration" as it is used in CCIOA. Rather, CCIOA

15

defines "declaration" as "<u>any recorded instruments however denominated, that create a common interest community</u>, including any amendments to those instruments and also including, but not limited to, plats and maps." § 38-33.3-103(13) (emphasis added).

¶43    This provision makes several things clear: first, inclusion of the word "Declaration" in a document's title says nothing about whether that document is a declaration for purposes of CCIOA; second, a declaration need not consist of a single document; and third, no declaration exists until some combination of recorded documents, taken together, "create[s] a common interest community."  <u>See</u> <u>id.</u>; <u>see also</u> Douglas Scott MacGregor, <u>Colorado Community Association Law: Condominiums, Cooperatives, and Homeowners Associations</u> § 2.1.1, at 58 (2011) ("[A]ny group of documents may collectively constitute a declaration, the only condition being that they include the statutorily mandated elements of a declaration."); <u>id.</u> § 2.1.2, at 59 ("What if documents <u>intended to create a common interest community</u>—<u>and, therefore, to qualify as a declaration</u>—fail to include the required elements?" (emphasis added)).[5]

¶44    So, what must the recorded documents do in order to "create" a common interest community?  One prerequisite, surely, is that they provide for the statutory components

---

[5] This understanding of the term declaration is consistent with the Uniform Common Interest Ownership Act, §§ 1-101 to 5-110 (Unif. Law Comm'n 1982) [hereinafter UCIOA], on which CCIOA is based, <u>Giguere v. SJS Family Enters., Ltd.</u>, 155 P.3d 462, 467 (Colo. App. 2006); MacGregor, <u>supra</u>, § 1.1.5, at 15.  The UCIOA uses a definition of declaration that is materially identical to CCIOA's, <u>see</u> § 1-103(13), and explains in a comment that "declaration" includes "any . . . instruments which create the relationship which constitutes a common interest community.  If those recorded instruments create that relationship, then those documents constitute a declaration . . . ," § 1-103 cmt. 12.  Further, the UCIOA excludes certain documents—such as an association's bylaws and articles of incorporation—from the definition of "declaration" because "[s]uch documents do not '<u>create</u>' the common interest community." <u>Id.</u> (emphasis added).

of such communities. CCIOA defines "common interest community" as "real estate described in a declaration with respect to which a person, by virtue of such person's ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration." § 38-33.3-103(8); see also Evergreen Highlands Ass'n v. West, 73 P.3d 1, 8 (Colo. 2003) (describing common interest communities as "residential communities in which there exists a mandatory obligation or servitude imposed on individual owners to pay for common elements of the community"). Thus, for one or more documents to create a common interest community (and hence amount to a declaration), they must, at a minimum, (1) establish an obligation to pay for various expenses associated with common property and (2) attach that obligation to individually owned property.

¶45 Here, the CCR failed to establish this arrangement and therefore was not, by itself, the statutory declaration for the Countryside Subdivision. Although the CCR set forth the requisite obligation to pay for common-element maintenance, it did not attach that obligation to any property at the time it was recorded: by its terms, the CCR encumbered only the real property listed in Exhibit A, but Exhibit A listed no real property.

¶46 Nor did recordation of the Plat, considered together with the CCR, achieve this result. While Exhibit D described property that could be made subject to the CCR's maintenance obligation—and thus could become the encumbered real estate that would constitute a common interest community—the CCR prescribed additional steps that needed to be taken before this could happen. Recording the Plat was one of these steps,

17

but it wasn't the only one. Under article XII, section 5(a), Pulte also needed to record a deed conveying a portion of the property to a third party or an "Annexation of Additional Land" form. Until both of these steps were complete, none of Pulte's property was made subject to the CCR or its maintenance covenant.

¶47 Because neither the CCR alone, nor the CCR and the Plat together, encumbered any individually owned property with an obligation to pay for maintenance of other property, there still was no CCIOA "declaration" for the Countryside Subdivision when the CCR and Plat were recorded. Because there was no declaration, no common interest community had been created under the Act, see § 38-33.3-201(1), and the court of appeals erred in concluding otherwise.

¶48 Instead, the community was created when Pulte first deeded property to a third party, thereby subordinating that property to the CCR—only then was there individually owned real estate subject to a covenant to pay for the maintenance of other real estate. See § 38-33.3-103(8). Once that arrangement was established, the CCR, Plat, and deed, and any other relevant prior documents, constituted a "declaration" within the meaning of CCIOA and, as such, needed to comply with the various requirements separately imposed on all declarations by section 38-33.3-205 of the Act.[6] Accord

---

[6] For reasons made apparent below, it is important to note the critical distinction between Pulte's deeding away its first property to create the community and Pulte's subsequently deeding away any of its remaining properties in an effort to add those properties to the then-existing community. At the time of the former transaction, the CCR was merely a private instrument akin to a contract, dictated principally by its own provisions. Once the community was created, however, the CCR became a component of a statutory declaration, dictated primarily by CCIOA and only secondarily by its own terms. As a result, to say, as a matter of document interpretation, that conveying

Uniform Common Interest Ownership Act, § 1-103 cmt. 12 (Unif. Law Comm'n 1982) (stating that, if the "recorded instruments create th[e] relationship [which constitutes a common interest community], then those documents constitute a declaration and must contain . . . the information required by Section 2-105," which is the Uniform Common Interest Ownership Act counterpart to section 38-33.3-205); see also § 38-33.3-205(1) (providing that "[t]he declaration must contain" the applicable items listed in paragraphs (a) through (q) of the subsection).

¶49 Looking to several of these additional requirements and related CCIOA provisions, we further conclude that the court of appeals erred in determining that, once the community was created, all of Pulte's platted property was brought into it automatically. See Denver Post, 255 P.3d at 1088 ("[W]e look to the plain meaning of the statutory language and consider it within the context of the statute as a whole."). To the contrary, the Act clearly permitted Pulte to withhold its remaining properties from the community and reserve the right to incorporate them gradually over time in accordance with certain constraints.

¶50 Section 38-33.3-205 distinguishes between property that is included in a community and property that is not, but may be, included in that community, but mandates that both classes of property be described in the declaration. Specifically, section 38-33.3-205(1)(c) states that a declaration must contain "[a] legally sufficient

property to a third party rendered that property subject to the CCR's maintenance covenant—and thus gave rise to the relationship that constitutes a common interest community—is very different than saying, as a matter of statutory interpretation, that conveying property to a third party brought that property into an existing common interest community in compliance with CCIOA.

19

description of the real estate included in the common interest community," while section 38-33.3-205(1)(h) says the declaration also must contain "[a] description of any development rights . . . reserved by the declarant, together with a description sufficient to identify the real estate to which each of those rights applies . . . ." And the statute's definition of "development rights" makes plain that this latter category of property—i.e., property subject to development rights—need not be included in the community. See § 38-33.3-103(14)(a) (defining "development rights" as including the right to "[a]dd real estate to a common interest community"). Thus, CCIOA recognizes that, even after a community is created, the declaration which created the community may address property subject to development rights as a category of land distinct from the property included in the community at its inception.

¶51　　The several components of the declaration here did just that: the CCR, Plat, and deed collectively specified property included in the Countryside Subdivision at its creation, and the CCR and Plat sufficiently described other "annexable property"—which comprised Pulte's remaining land—that Pulte could "annex" to the community by taking additional steps. As we elucidated in Ryan Ranch, issued today, the reserved right to "annex" property to a common interest community is a development right under the Act, see ¶¶ 27–32 (equating the rights to "annex" property and to "[a]dd real estate to a common interest community" under section 38-33.3-103(14)(a)), and the land to which that right is attached therefore falls under the category of property that is subject to development rights but not yet included in the community, see id.; see also §§ 38-33.3-103(14)(a), -205(1)(h).

¶52 Yet, whatever the advantages to a developer of withholding land from a community and reserving the right to add it later, as opposed to including it from the beginning, our analysis in Ryan Ranch also demonstrates that this choice comes with certain strings attached. In that case, we construed a CCR materially identical to the one at issue here and determined that the initially withheld "annexable property" there could not be added to the community absent compliance with the requirements CCIOA imposes on the exercise of development rights. See Ryan Ranch, ¶¶ 33–38. Specifically, we explained that, in order to "annex" that property to the community, the developer needed to execute "an 'amendment to the declaration' that (1) assigned an identifying number to each new unit created, (2) reallocated the allocated interests among all units, and (3) described any common elements or limited common elements created," id. at ¶ 39 (citing § 38-33.3-210(1)), and record and index that amendment in a particular way, see id. at ¶¶ 35, 44 (describing the requirements of section 38-33.3-217(3)). The fact that the annexable properties were depicted on a plat was not enough. See id. at ¶¶ 37–51.

¶53 The same is true of Pulte's remaining "annexable property" here. Once the community was created, the CCR became a part of a CCIOA-governed declaration and Pulte's right to annex its remaining properties became a statutory development right reserved in a declaration. Accordingly, Pulte could not consummate that right as to any of its properties unless and until it complied with CCIOA's provisions controlling the exercise of development rights. It follows that the court of appeals erred in concluding

21

that all of Pulte's platted properties were automatically included in the Countryside Subdivision upon its creation.[7]

## B. Pulte's Liability for Assessments

¶54    Having concluded that Pulte's properties could not become part of the community until Pulte affirmatively added them to it, we now consider Pulte's liability for assessments under the CCR and the Act, in turn.

## 1. Liability Under the CCR

¶55    Article IV of the CCR creates the covenant for maintenance assessments. Under section 5 of that article, Pulte, as the declarant, was liable for all common expenses "[u]ntil the Association makes an annual assessment." Once that happened, section 1 of the same article states that each "Owner" was obligated to pay such assessments. Specifically, section 1 provides that, when an owner accepts the deed to a property, the owner "covenants and agrees and shall be personally obligated to pay the Association: annual assessments or charges, special assessments, and other charges, fines, fees, interest, late charges, and other amounts, all as provided in this [CCR]."

---

[7] We recognize that, in Ryan Ranch, we concluded the alleged annexation-by-deed of the properties at issue there failed for lack of compliance with the Act. Ryan Ranch, ¶¶ 37–51. Here, however, the validity of the individual annexations of Pulte's properties is not significant. Our task in this case is to determine whether the properties became a part of the Countryside Subdivision while Pulte owned them—whether the annexations by deed succeeded or failed, the outcome is the same: they did not. Thus, unlike in Ryan Ranch, here we need not, and so do not, decide whether the properties were later brought into the community in compliance with CCIOA. Indeed, because the record contains none of the individual deeds to Pulte's properties, we could not decide this question even if we wanted to. Cf. id. at ¶¶ 37–51 (analyzing, in part, the deed conveying the properties from the declarant to a third party to determine whether that deed satisfied CCIOA's requirements for exercising development rights).

¶56     Article IV, section 1 specifically states that Pulte could be an "Owner."  Article I, section 20 defines "Owner" as "the Declarant, a Builder or other Person <u>who owns a Lot</u>, but does not include a Person having an interest in a Lot solely as security for an obligation."  (Emphasis added.)  Thus, while Pulte could be an owner, it had to "own[] a Lot" to be one.

¶57     The CCR, in article I, section 17, defines "Lot" as

> each platted lot or parcel of land shown upon any recorded Plat or other recorded map of the real property described on the attached Exhibit A, as the same may be amended from time to time, as well as each platted lot or parcel of land shown upon any recorded Plat of any other real property as may hereafter be brought within the jurisdiction of the Association, with the exception of the Common Elements . . . .

This provision makes clear that only property described on Exhibit A or later brought within the community can constitute a Lot.  As explained above, Exhibit A does not describe any property, and article XII, section 5 contains the CCR's sole mechanism for amending Exhibit A and bringing property within the community.  Article XII, section 5(a) explains that property annexed by deed "shall constitute a Lot"; that property annexed by form would become a "new Lot"; and that either type of document "shall be deemed an amendment" to the CCR.  Thus, under the CCR, only property annexed pursuant to section 5(a) could become a Lot.

¶58     But here, Pulte never owned property annexed pursuant to section 5(a).  While it could have owned property annexed by consent or by form, neither of these processes was used in this case.  And property could be annexed through the CCR's lone remaining process—annexation by deed—only if Pulte conveyed the property to a third

23

party, thereby relinquishing ownership of it.  Pulte therefore did not "own a Lot" and, as a result, was not an "Owner" under article I, section 20 of the CCR.  Because Pulte was not an "Owner," it was not liable under article IV, section 1 for maintenance assessments levied by the Association.

## 2.  Liability Under CCIOA

¶59    The Association argues that, even if Pulte is not liable under the CCR, it is liable under section 38-33.3-307(2) of CCIOA.  Again, we disagree.

¶60    Section 38-33.3-307(2) provides in relevant part:

> [T]he declarant alone is liable for all expenses in connection with real estate within the common interest community subject to development rights.  No other unit owner and no other portion of the common interest community is subject to a claim for payment of those expenses. . . . If the declarant fails to pay all expenses in connection with real estate within the common interest community subject to development rights, the association may pay such expenses, and such expenses shall be assessed as a common expense against the real estate subject to development rights, and the association may enforce the assessment pursuant to section 38-33.3-316 by treating such real estate as if it were a unit.

By its plain terms, this provision applies to "real estate <u>within the common interest community</u> subject to development rights."  § 38-33.3-307(2) (emphasis added).  As discussed already, however, Pulte did not own real estate "within the common interest community" because (1) its properties could not be brought into the community until they were "annexed" through a procedure that satisfied CCIOA's requirements, and (2) under the only procedure claimed to have been used here—annexation by deed— any annexation of property either failed for lack of compliance with the Act or was achieved only upon Pulte's relinquishing ownership of the property.  That being the

case, section 38-33.3-307(2) does not apply in the present situation and therefore imposes no liability on Pulte.

¶61 In light of this discussion, we conclude the trial court properly granted summary judgment to Pulte on the issues of its contractual and statutory liability for assessments, and the court of appeals erred in reversing that decision.

## C. The Association's Unjust Enrichment Claim

¶62 Finally, we reject the Association's argument, in its cross-petition, that the court of appeals erred in affirming the trial court's disposal of its unjust enrichment claim.

¶63 Unjust enrichment is a quasi-contractual, equitable remedy designed to undo a benefit conferred on one party at the unfair expense of another party. Lewis v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008). To prevail on an unjust enrichment claim, a party "must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." Id.

¶64 A party generally cannot recover for unjust enrichment, however, where there is an express contract addressing the subject of the alleged obligation to pay. See Dudding v. Norton Frickey & Assocs., 11 P.3d 441, 445 (Colo. 2000); see also Interbank Invs., LLC v. Eagle River Water & Sanitation Dist., 77 P.3d 814, 816 (Colo. App. 2003) ("[A] party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract."). Colorado appellate courts have recognized only two exceptions to this rule—a party may still recover for unjust enrichment when (1) the

25

express contract fails or is rescinded, see Dudding, 11 P.3d at 445, or (2) the claim covers matters that are outside of or arose after the contract, see Interbank, 77 P.3d at 816.

¶65 Here, the CCR directly addresses liability for maintenance costs. Article IV, section 2 authorizes the Association to levy assessments "to pay the Common Expenses and for maintenance, repair and replacement of the Common Elements . . . and for all of those purposes and activities which may be required of the Association or which the Association may be empowered to pursue." The unqualified breadth of the CCR's definition of "Common Expenses" makes clear that this assessment authority embraces any cost the Association incurs: article I, section 10 defines common expenses as, simply, "expenditures made or liabilities incurred by or on behalf of the Association, together with any allocations to reserves."

¶66 Article IV, section 1, in turn, assigns liability for the Association's costs exclusively to "Owners," compelling each "Owner" to pay the Association for "annual assessments or charges, special assessments, and other charges, fines, fees, interest, late charges, and other amounts, all as provided in this [CCR]." And article IV, section 9 adds that "[f]ees, charges, late charges, attorneys' fees, fines and interest charged pursuant to this [CCR] or the Act are enforceable as assessments."

¶67 These provisions expressly address liability for the charges at issue and therefore bar the Association's unjust enrichment claim unless one of the two exceptions applies. Neither does: the CCR has not been rescinded and no party claims it is defective, see Dudding, 11 P.3d at 445, and the alleged past-due assessments are squarely encompassed in the provisions laid out above, see Interbank, 77 P.3d at 816. Thus, the

26

court of appeals correctly concluded that the Association does not have a remedy for unjust enrichment.

## IV. Conclusion

¶68 Under the terms of the CCR at issue here, and consistent with CCIOA, we conclude that recordation of the CCR and the Plat alone did not form a common interest community. Rather, the community was formed when Pulte first subjected property to the CCR, and Pulte's remaining properties could not become part of the community until Pulte "annexed" them in accordance with certain prescribed steps. Because Pulte's properties were not part of the community until they were annexed, and Pulte was not otherwise liable for assessments, the court of appeals erred in reversing the trial court's grant of summary judgment on the Association's breach of contract and statutory violation claims. We further conclude that because the CCR fully allocates the responsibility to pay for assessments, the court of appeals correctly concluded that the Association has no remedy for unjust enrichment. We therefore reverse in part and affirm in part and remand for further proceedings consistent with this opinion. On remand, the trial court should reconsider the parties' respective entitlements to attorneys' fees and costs. See C.A.R. 39.5.

**JUSTICE COATS** concurs in part and concurs in the judgment, and **JUSTICE EID** and **JUSTICE MÁRQUEZ** join in the concurrence in part and concurrence in the judgment.

JUSTICE COATS, concurring in part and concurring in the judgment.

¶69    Because I agree with the majority that a common interest community cannot be created in this jurisdiction without including any real property, that property cannot be added to a common interest community by the declarant without amending the declaration as required by statute, and that summary judgment was properly granted against the homeowners association on its claim of unjust enrichment, I concur in part and in the judgment of the court.  I do not, however, agree that upon conveying a property identified as "annexable" in the recorded Declaration of Covenants, Conditions and Restrictions of Countryside Community Association (the "CCR"), and recording the deed conveying that property, the CCR, the recorded plat describing that property, and the deed itself constituted a declaration, creating a common interest community within the contemplation of the Colorado Common Interest Ownership Act, §§ 38-33.3-101 to -402, C.R.S. (2016).

¶70    For the reasons given by the majority, I do not believe a common interest community was created by recording the CCR and plat of annexable property alone.  I would, however, more straightforwardly find that the requirement of section 38-33.3-205(1)(c), that a declaration creating a common interest community must contain a legally sufficient description of the real estate included in that community, necessarily implies that the community contain some real estate.  Notwithstanding referring to itself as a declaration, an instrument purporting to create a common interest community but indicating that the community includes no real estate simply fails, on its

1

face, to accomplish that purpose, and therefore cannot constitute a declaration within the meaning of the Act.

¶71 The majority apparently concedes the obvious point that property cannot be annexed to a common interest community that does not exist, regardless of the terms of a purported declaration; but it nevertheless appears to hold that a document describing a method for annexing property to a common interest community, in conjunction with the annexation of some property in the manner described, actually creates the community, to which other annexable property can then be added. With this creative proposition I cannot agree. Some real estate must be sufficiently described in a recorded declaration as being included in the community for the community to be created in the first place. I do not believe that a document describing a method for bringing property into a common interest community can meaningfully be said to comply with this statutory requirement at some point in the future when that method is put into use, any more than I believe common interests can be said to have been reallocated by a formula specified in a declaration for reallocating those interests in the event more units are added in the future. Cf. Ryan Ranch Cmty. Ass'n v. Kelley, 2016 CO 65, __ P.3d __ (Coats, J., specially concurring). I would especially find this to be the case where the document purporting to create a common interest community continues to facially describe the community as including no properties whatsoever.

¶72 For these reasons as well as those articulated in my separate opinion in Ryan Ranch, I believe not only that the statutory scheme fails to contemplate the creation of a shell common interest community, including no real estate whatsoever, but also that a

common interest community does not spring into being upon the recording of a deed conveying "annexable" property described in a document purporting to create such a shell community.

¶73 I therefore concur in part and in the judgment of the court.

I am authorized to state that JUSTICE EID and JUSTICE MÁRQUEZ join in this concurrence in part and concurrence in the judgment.