Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us.  Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 1, 2017

**2017 CO 38**

**No. 15SC513, <u>McShane v. Stirling Ranch Property Owners Association, Inc.</u>—Exemption from Liability—Exculpatory Contracts— Corporation as Distinct Entity—Corporate Actions through Agents—Vicarious Liability.**

The supreme court addresses whether a homeowners association may benefit from exculpatory clauses in the community's declaration and bylaws when those clauses do not name the association as a protected party.  Because the plain language of the exculpatory clauses at issue in this case does not limit the association's liability, and the association, as an entity distinct from internal boards acting as its agents, cannot benefit from exculpatory clauses protecting those agents, the supreme court concludes the petitioners may bring their claims against the association.

**2017 CO 38**

**Supreme Court Case No. 15SC513**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA248

**Petitioners:**

Mac McShane and Cynthia Calvin,

v.

**Respondent:**

Stirling Ranch Property Owners Association, Inc.

**Judgment Reversed**
*en banc*
May 1, 2017

**Attorneys for Petitioners:**
Neiley Law Firm, LLC
Richard Y. Neiley, Jr.
Richard Y. Neiley, III
  *Glenwood Springs, Colorado*

**Attorneys for Respondent:**
Hall & Evans, L.L.C.
Alan Epstein
Lance G. Eberhart
Timothy M. Murphy
  *Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE EID** dissents, and **JUSTICE MÁRQUEZ** joins in the dissent.

¶1 Petitioners Mac McShane and Cynthia Calvin had once hoped to build a multistory home overlooking the Roaring Fork Valley near Carbondale. After belatedly discovering their design for that home exceeded Garfield County height regulations, however, they ended up with something less: a one-story home and an attached "pod." Making the required changes proved costly.

¶2 Today, we decide whether McShane and Calvin can seek to assign any of those costs to the Stirling Ranch Property Owners Association ("POA"), which they allege improperly approved the faulty architectural plans and then later improperly denied approval of revised plans as well. Because the plain language of the declaration and design guidelines governing Stirling Ranch properties does not limit the POA's liability, and the POA cannot benefit from exculpatory clauses protecting its boards and agents, we conclude McShane and Calvin may bring their claims.

## I. Facts and Procedural History

¶3 Mac McShane and his wife Cynthia Calvin (collectively, "the Owners") purchased a lot in Stirling Ranch, a planned unit development in Garfield County, seeking to build a home atop a bluff surveying the Roaring Fork Valley.

¶4 Their conflict with the POA concerns the rules and regulations governing properties in that community, including the Second Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements for Stirling Ranch, P.U.D. ("Declaration"). The Owners' lot is subject to the Declaration. The Declaration created the POA. Each lot owner within Stirling Ranch is a member of the POA. The POA is in

2

turn governed by the Executive Board, which appoints the Design Review Board ("DRB").

¶5 The DRB promulgated and enforced the Stirling Ranch Design Guidelines ("Design Guidelines") intended to preserve "the Ranch's unique character, . . . natural beauty and . . . the quality of open space." Under those guidelines, all improvements require DRB approval to proceed. And to win DRB approval, the improvements must comply with both the Design Guidelines and Garfield County height restrictions.

¶6 After first submitting plans to the DRB in 2010, the Owners sought approval of them in earnest in 2011. Their architect drafted a cover sheet to accompany those plans, and in it he averred that the house would comply with Garfield County height restrictions. "This," the trial court noted, "later proved to be incorrect."

¶7 Relying in part on the representation in the cover sheet, the DRB granted final design approval for the multistory home, and the Owners began building. Construction proceeded without issue until December 2011, at which point the neighboring lot owners returned from a vacation to find the Owners' partly finished garage spoiling their view. As members of both the Executive Board and the DRB were working to resolve that issue, Garfield County learned the house would exceed its height restrictions and issued a stop-work order. Work stopped.

¶8 In the months that followed, the Owners secured a new architect who revised the design but retained a second story. Garfield County approved those plans, but the DRB and Executive Board did not. After another round of redesigns, in which the multistory

proposal became a single-story design with an attached "pod," the DRB approved the plans, and the Owners built the home as designed.

¶9 Because the Owners blamed the POA for the costs associated with the single-story conversion, they filed suit. The Owners pursued declaratory judgment/equitable estoppel and negligence claims against the POA, alleging more than $260,000 in damages. Pointing to two exculpatory clauses, one in the Declaration and another in the Design Guidelines, the POA argued those claims were barred.

¶10 The clause in the Declaration provided as follows:

The Design Review Board will use reasonable judgment in accepting or disapproving all plans and specifications submitted to it. Neither the Design Review Board nor any individual Design Review Board member will be liable to any person for any official act of the Design Review Board in connection with submitted plans and specifications, except to the extent the Design Review Board or any individual Design Review Board member acted with malice or intentional wrongful acts. Approval by the Design Review Board does not necessarily assure approval by the appropriate governmental body or Garfield County. Notwithstanding that the Design Review Board has approved plans and specifications, neither the Design Review Board nor any of its members will be responsible or liable to any Owner, developer or contractor with respect to any loss, liability, claim or expense which may arise by reason of such approval of the construction of the improvements. Neither the Executive Board, the Design Review Board, nor any agent thereof, nor Declarant, nor any of its partners, employees, agents or consultants will be responsible in any way for any defects in any plans or specifications submitted, revised or approved in accordance with the provisions of the Association Documents, nor for any structural or other defects in any work done according to such plans and specifications. In all events the Design Review Board will be defended and indemnified by the Association in any such suit or proceeding, which may arise by reason of the Design Review Board's decisions.

4

¶11    Section II.D of the Design Guidelines[1] contained the following exculpatory provision:

> Neither the DRB nor any member of the DRB will be liable to the POA, any owner or any other person for any damage, loss or prejudice suffered or claimed on account of:
>
> 1. Approving or disapproving any plans, specifications and other materials, whether or not defective;
> 2. Constructing or performing any work, whether or not pursuant to approved plans, specifications and other materials;
> 3. The development or manner of development of any land within Stirling Ranch;
> 4. Executing and recording a form of approval or disapproval, whether or not the facts stated therein are correct; and
> 5. Performing any other function pursuant to the provisions of these Guidelines or the Declaration.

¶12    Reviewing those provisions, both the trial court and the court of appeals concluded the exculpatory clauses, while not specifically naming the POA, barred the Owners' declaratory judgment/equitable estoppel and negligence claims.

¶13    The trial court concluded that the exculpatory clauses were valid and protected the POA. The court first considered the four factors we articulated to analyze an exculpatory agreement's validity in Jones v. Dressel, 623 P.2d 370, 376 (Colo. 1981): (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the

---

[1] The appellate record contains two versions of the Design Guidelines, one dated June 9, 2011, and another, amended version dated November 28, 2011. We review the November 28 version the trial court quoted in the order now at issue. We recognize, however, that the November 28 version replaced a reference to the "Master Association" in section II.D with "POA," but because, read in context, "Master Association" could only have referred to the POA, that change is not material to our analysis.

parties is expressed in clear and unambiguous language.  Applying those factors, the trial court concluded the clauses were valid.  It then went on to reason that the clauses protected the POA under these circumstances because the Owners based their claims against the POA on the actions of the protected boards.

¶14    The court of appeals adopted a similar position and affirmed the trial court's decision.  The division below first concluded that the POA and its boards were a single legal entity and thus appears to have assumed that if the exculpatory clauses were valid as to the boards, they would protect the POA as well.  The division then addressed each of the Jones factors, finding that (1) design approval under the Design Guidelines was not a matter of public concern; (2) design approval was not an unavoidable practical necessity; (3) the exculpatory agreements were not unfairly agreed upon; and (4) the clauses' plain language released the boards from liability, so the parties' intent was clear.  Thus, the division ultimately concluded that the clauses validly exculpated the boards and therefore exculpated the POA as well.

¶15    We granted the Owners' petition asking us to review the judgment of the court of appeals.[2]

---

[2] We granted certiorari to review the following issues:

1. Whether the court of appeals' decision in this case is in accord with the supreme court's holding in Jones v. Dressel, 623 P.2d 370, 376 (Colo. 1981) and its progeny when the court of appeals expanded limitation of liability protection to a party not expressly named in the exculpatory language.

2. Whether the court of appeals erred in holding that there is no distinction in law between the corporate entity of the Property Owners Association and its Executive Board and Design Review Board, thereby extending the protections of the exculpatory language to the Property Owners Association.

## II. Standard of Review and Rules of Declaration and Bylaw Construction

¶16 We review the interpretation of covenants and other recorded instruments de novo, as we would a contract. Pulte Home Corp. v. Countryside Cmty. Ass'n, 2016 CO 64, ¶ 23, 382 P.3d 821, 826. In doing so, we look first to the documents' plain language, giving words and phrases their common meanings. Id. We will enforce such documents as written if their meaning is clear. Id. Similarly, we hold no authority to rewrite contracts and must enforce unambiguous documents in accordance with their terms. Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, 577 P.2d 748, 751 (Colo. 1978).

¶17 In assessing the effect of those terms, we consider the law existing at the time a contract was executed as a part of the document itself. See Cocquyt v. Shower, 189 P. 606, 607 (Colo. 1920) (holding parties presumed to know the law and could not have contemplated contractual silence would produce a result contrary to law); Shaw v. Sargent Sch. Dist. No. RE-33-J ex rel. Bd. of Educ., 21 P.3d 446, 450 (Colo. App. 2001) ("[C]ontractual language must be interpreted in light of existing law, the provisions of which are regarded as implied terms of the contract, regardless of whether the agreement refers to the governing law." (quoting 11 Williston on Contracts § 30:19 (4th ed. 1999))).

¶18 Exculpatory clauses require an additional consideration. Because our law has long disfavored such agreements, they must be strictly construed against the party

seeking to limit its liability.  See Heil Valley Ranch, Inc. v. Simkin, 784 P.2d 781, 783–84 (Colo. 1989).

## III.  Analysis

¶19     The parties debate whether we should invalidate the exculpatory clauses or overrule our precedent regarding principal/agent liability.  We take a simpler path, however.  At the outset, we conclude the clauses' plain language does not name, and therefore does not exculpate, the POA.  We then consider and reject two contentions that the plain language might exculpate the POA by other means.  First, because our case law and the documents at issue recognize that a corporation is an entity distinct from its agents, we conclude the clauses do not exculpate the POA simply by virtue of exculpating its boards.  Second, we decline to overrule our precedent holding that the release of an agent does not automatically release the principal, and we further observe that even if we were to do so, the POA would not benefit.  Thus, we conclude that the exculpatory clauses do not bar the Owners' claims against the POA.

## A. Plain Language

¶20     Exculpatory agreements, which attempt to insulate parties from their own negligence, deserve close scrutiny, and thus we consider first whether such agreements are valid and enforceable.  Jones, 623 P.2d at 376.  To do so, we analyze four factors: (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language.  Id.  Under no circumstances

8

will an exculpatory agreement be permitted to shield against a claim of willful and wanton negligence. Id.

¶21    Here, we need not address the more involved analysis Jones requires because even assuming the exculpatory clauses are valid, they do not exculpate the POA. We look first to the clauses' plain language to determine their effect. Pulte, ¶ 23, 382 P.3d at 826. That language limits liability for a wide range of entities—the DRB and the Executive Board among them—but does not mention the POA. The Design Guidelines, moreover, discuss the POA in relation to liability, and even contemplate that the POA might seek to hold the DRB liable, yet they do not exculpate the POA itself. In short, the documents' drafters could have exculpated the POA but did not. Recognizing again that we must strictly construe such clauses against the party seeking to limit its liability, Heil Valley Ranch, 784 P.2d at 784, we cannot now rewrite the language at issue to protect a party not named originally.

## B. Corporation's Status as a Separate Entity

¶22    Might the exculpatory clauses still protect the POA by some other means, though? The court of appeals and trial court thought so, concluding that the POA, DRB, and Executive Board were a single entity, and that by exculpating the boards, the clauses at issue necessarily exculpated the POA. That characterization, however, conflicts with both Colorado law and the clauses' plain language. To be sure, we have consistently held that a corporation acts only through its agents. E.g., Dallas Creek Water Co. v. Huey, 933 P.2d 27, 41 (Colo. 1997). But this does not mean they are one and the same. Instead, we recognize that while those agents act on behalf of the

corporation, the corporation itself is "always a separate entity."[3] Leonard v. McMorris, 63 P.3d 323, 330 (Colo. 2003). We see no reason to depart from these settled principles today.

¶23 The exculpatory clauses' plain language also indicates that the POA is an entity distinct from the boards. First, the Declaration requires the POA to defend and indemnify the DRB, an unnecessary measure if the two were one and the same. Second, section II.D of the Design Guidelines prevents the POA from holding the DRB liable under certain circumstances. If the two were a single entity, however, the POA would never have cause to hold the DRB liable—its claim would be against itself.

¶24 Applying both our law and the understanding evinced in the Declaration and the Design Guidelines, we conclude the POA, like any other corporation, acts through its boards and other agents but remains a separate entity. The division below therefore erred in concluding the exculpatory clauses limited the POA's liability simply because they exculpated the boards.

## C. Legal Effect of Exculpating an Agent

¶25 The POA suggests an alternative understanding and asks us to give new legal effect to the plain language. By exculpating the boards, the POA contends, the Declaration and Design Guidelines necessarily exculpated the POA because its liability as a principal could derive only from the negligence of its exculpated agents. See City of Aurora ex rel. Util. Enter. v. Colo. State Eng'r, 105 P.3d 595, 622 (Colo. 2005)

---

[3] We state this as a general proposition of law and do not announce an alternative framework for analyzing whether a party's actions may allow a litigant to pierce the corporate veil—a body of law not implicated here.

(describing respondeat superior liability). Yet that position conflicts with our conclusion in <u>Dworak v. Olson Constr. Co.</u>, 551 P.2d 198 (Colo. 1976). There, we held that a party may sue a principal on a theory of respondeat superior even if he executes a covenant not to sue the agent and that covenant does not expressly reserve the right to sue the principal. <u>Id.</u> at 200.

¶26 We decline this invitation to overrule our decision in <u>Dworak</u>. The principle of stare decisis, which "promotes uniformity, certainty, and stability of the law," <u>People v. LaRosa</u>, 2013 CO 2, ¶ 28, 293 P.3d 567, 574, requires us to follow a preexisting rule of law unless we are "clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come from departing from precedent," <u>People v. Blehm</u>, 983 P.2d 779, 788 (Colo. 1999). We are not so convinced and do not reject <u>Dworak</u>'s rule now.

¶27 Even if we were to overturn our rule in <u>Dworak</u>, moreover, it would not benefit the POA. Because our initial task is to interpret and give effect to the language in the Declaration and Design Guidelines, <u>see</u> <u>Pulte</u>, ¶ 23, 382 P.3d at 826, we must decide what meaning to afford the documents' silence regarding the POA's liability. To do so, we look to the legal effect of that silence at the time the Declaration and Design Guidelines were executed as indicative of its intended meaning. <u>See</u> <u>Cocquyt</u>, 189 P. at 607. Thus, even if we were to adopt a new rule now, it would not shed light on the clauses' intended meaning at the time of execution.

¶28 Here, the documents at issue post-date <u>Dworak</u>, and <u>Dworak</u> therefore supplied the legal effect of silence regarding the POA's liability. <u>See</u> <u>Chadwick v. Colt Ross</u>

11

Outfitters, Inc., 100 P.3d 465, 468–69 (Colo. 2004) (treating an exculpatory agreement and a release of liability as interchangeable). Under Dworak, 551 P.2d at 200, in the absence of a specific provision exculpating the POA, the POA remained open to suit, even though the clauses limited the liability of the POA's agents. At all relevant times, then, the legal effect of silence regarding the POA's liability was such that the POA could not benefit from protections the exculpatory clauses afforded its agents.

¶29 We cannot now construe the documents' silence to give it a meaning it could not have enjoyed at the time the Declaration and Design Guidelines were executed. See Cocquyt, 189 P. at 607. Indeed, if the clauses' drafters had intended a result other than the one required by our case law, we would expect them to have included language to that effect. They didn't, and we have no authority to rewrite the clauses to produce that result today.

## IV. Conclusion

¶30 Because the plain language of the Declaration and Design Guidelines governing Stirling Ranch properties does not limit the POA's liability, and the POA cannot benefit from exculpatory clauses protecting its boards and agents, we conclude McShane and Calvin may bring their claims against the POA. We therefore reverse the decision of the court of appeals and remand this case for further proceedings consistent with this opinion.

JUSTICE EID, dissenting.

¶31    Today, the majority concludes that the Owners may pursue their suit against the Stirling Ranch Property Owners Association ("POA"), because, although relevant documents release the Design Review Board ("DRB") from liability for design decisions, there is no mention of a release of the POA. I would not permit the Owners to make such an end-run around the release. As the trial court concluded, the Owners' entire case is premised on the POA's alleged liability for the acts of the DRB. See Am. Compl. ¶ 3 ("The POA, acting through its Design Review Board ('DRB'), exercises architectural review and approval authority for all residential construction within Stirling Ranch."). If the DRB's actions are immune, there are no negligent acts to impute to the POA. Accordingly, I would affirm the court of appeals on this ground, and I respectfully dissent from the majority's opinion.

¶32    The Declaration specifies that neither the DRB nor any of its members will be liable to any owner for "any official act" or for "any loss, liability, claim or expense which may arise by reason of such approval" of design plans, and that the DRB will not be responsible "in any way for any defects in any plans or specifications submitted, revised or approved." Maj. op. ¶ 10. The Design Guidelines emphasize further that the DRB will not be liable to any owner for "[a]pproving or disapproving any plans, specifications and other materials, whether or not defective." Id. at ¶ 11. No one disputes that the language of the Declaration and the Design Guidelines expressly shields the acts of the DRB from liability.

1

¶33    The Owners argue, and the majority agrees, that although the relevant language precludes them from holding the DRB liable for its allegedly negligent acts with regard to the design of their home, it does not preclude them from suing the POA. This conclusion, although perhaps technically correct, does not address the trial court's ultimate disposition of the case. The trial court concluded that the entirety of the Owners' lawsuit against the POA is based on an imputation theory—specifically, that the alleged negligent acts of the DRB should be imputed to the POA. Indeed, the entirety of the Owners' complaint is founded on the allegation in paragraph 3, namely, that the "POA, acting through its Design Review Board ('DRB'), exercises architectural review and approval authority for all residential construction within Stirling Ranch." See also Am. Compl. ¶¶ 42–47 (allegations preceded by "The POA, acting through the DRB . . ."). The Owners do not suggest that the POA somehow acted independently or in a fashion distinct from the DRB.[4]

¶34    The trial court thus properly concluded that "Plaintiffs['] entire case involved alleged actions or inactions of the DRB which caused them damages." From this, the trial court reasoned, again properly in my view, that if the actions of the DRB are immune, there is simply nothing to impute to the POA "since the basis for all acts of negligence were acts of the DRB." In other words, the release of the DRB extinguishes the foundation upon which to base any claim against the POA. Cf. Ferrer v.

_____

[4] Although the Amended Complaint alleged that the POA had a duty to supervise the DRB, the Owners did not ultimately pursue this theory of liability before the trial court.

2

<u>Okbamicael</u>, 2017 CO 14M, ¶ 28, 390 P.3d 836, 844 (where employer has conceded vicarious liability for acts of employee, direct negligence action against the employer falls away, given that "[d]irect negligence claims effectively impute the employee's liability for his negligent conduct to the employer").

¶35 The majority never addresses the basis of the trial court's ruling. Instead, it holds that "the POA cannot benefit" from the release language, and that therefore the Owners may proceed with their claims. Maj. op. ¶¶ 2, 30. The majority thus suggests that the Owners may proceed in making an end-run around the release. But this is simply not the case. On remand, the trial court should apply its previous conclusion—undisturbed on appeal—that because the Owners' complaint is premised entirely on the theory that the negligent acts of the DRB should be imputed to the POA, and because there are no negligent acts to impute, the Owners' claims are barred, and judgment should be entered in favor of the POA. Accordingly, I respectfully dissent from the majority opinion.

I am authorized to state that JUSTICE MÁRQUEZ joins in this dissent.