The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
September 26, 2019

## 2019COA148

**No. 18CA0977, *FD Interests v Fairways at Buffalo Run* — Real Property — Colorado Common Interest Ownership Act — Common Interest Communities — Creation, Alteration, and Termination**

A division of the court of appeals considers whether a residential development's common interest community declaration excluded the undeveloped portions of the property from the community until they were specifically annexed through recordation of supplemental plats and declarations. The division also considers whether errors in the chain of title for the property and the units built on it warranted reformation of the declaration.

The division concludes that the declaration encumbered the entire property, and that this interpretation renders inconsequential any concerns created by discrepancies between the statements in the declaration and the actual chain of title. Thus, although the

trial court erred by reforming the deed, the error was harmless, and the division affirms.

Court of Appeals No. 18CA0977
Adams County District Court No. 16CV31316
Honorable Emily E. Anderson, Judge

_____

FD Interests, LLC,

Plaintiff-Appellant,

and

Fairways Builders, Inc., Buffalo Run Fairways, LLC, and Fairways Homes, LLC,

Third-Party Defendants-Appellants,

v.

Fairways at Buffalo Run Homeowners Association, Inc.,

Defendant-Appellee,

and

William D. Monhollin Trust, the Nancy L. Monhollin Trust, Janice Van Gundy, and Jennifer Van Gundy,

Third-Party Defendants-Appellees.

_____

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE GROVE
Taubman and Hawthorne, JJ., concur

Announced September 26, 2019

_____

Hatch Ray Olsen Conant LLC, Robert W. Hatch, II, Christopher J. Conant, Erica G. Behm, Denver, Colorado, for Plaintiff-Appellant and Third-Party Defendants-Appellants

Altitude Community Law, P.C., William H. Short, Lakewood, Colorado; Fowler, Schimberg, Flanagan & McLetchie, P.C., Andrew R. McLetchie, Eden R. Rolland, Golden, Colorado, for Defendant-Appellee

The Sweetser Law Firm, P.C., Daniel A. Sweetser, Denver, Colorado, for Third-Party Defendants-Appellees

¶ 1    In this dispute concerning the interpretation and reformation of a residential development's common interest community declaration, appellants, FD Interests, LLC (FDI), Fairways Builders, Inc. (Builders), Buffalo Run Fairways, LLC (BRF), and Fairways Homes, LLC (Homes) (collectively, the Developer Entities), appeal the trial court's judgment in favor of appellees, Fairways at Buffalo Run Homeowners Association, Inc. (the HOA), and unit owners the William D. Monhollin Trust, the Nancy L. Monhollin Trust, Janice Van Gundy, and Jennifer Van Gundy.

¶ 2    The trial court concluded that the entire property, including both the developed and undeveloped portions of The Fairways at Buffalo Run (the Property), was subject to the terms of the legal document that created the HOA — the "Amended and Restated Declaration of Covenants, Conditions and Restrictions for Fairways at Buffalo Run Homeowners Association, Inc." (the CCR). The trial court found that the "parties d[id] not dispute the fact that the [CCR] was intended to govern the common interest community now known as The Fairways at Buffalo Run." But after identifying inconsistencies in the Property's chain of title, the court reformed

the CCR by adding BRF to the CCR's signature line, because despite its sole ownership of the Property at the time, it had not executed the CCR. The court reasoned that this reformation would cure the title defects.

¶ 3 We conclude that the trial court accurately determined that the CCR encompassed the entire Property when the community was established. This resolved the title concerns that the HOA and unit owners raised and made it unnecessary for the trial court to rule in equity to reform the CCR. Nonetheless, because the trial court's erroneous exercise of its equitable powers did not affect any party's substantial rights, we conclude that this error was harmless and therefore affirm.

## I. Background

¶ 4 This case requires us to consider two main issues. First, did the CCR encompass the entire Property from the outset or did it exclude the undeveloped portions of the Property from the community until they were specifically annexed into the development through recordation of supplemental plats and declarations? Second, do the errors in the chain of title for the

Property and the units built on it warrant reformation of the CCR? We address those questions after outlining this matter's complex factual and procedural background.

## A. Factual Background

¶ 5 In October 2005, FDI and Fairways Land, LLC purchased the Property, twelve and one-half acres of real property adjacent to the Buffalo Run Golf Course in Commerce City. The Property's legal description was "Lot 1, Block 1, The Villages at Buffalo Run East, Filing No. 3." The purchase transaction culminated in the October 13, 2005, recordation of a special warranty deed that was dated October 6, 2005.

### 1. Pre-Development and the Onset of Title Problems

¶ 6 Acquiring the land was the first step in developer Robin J. Harding's plan to create and operate the Property, a community designed for construction of up to sixty-nine patio homes. Harding formed several entities to carry out the project. He owned or ultimately managed those entities — including FDI, Builders, BRF, and Homes — and he signed documents on their behalf over the course of the Property's development.

¶ 7       On October 31, 2005, BRF recorded a final plat for the

Property, which encompassed all twelve and one-half acres and

stated that BRF was the owner.  BRF, however, did not own the

Property at that time.  FDI and Fairways Land did.

¶ 8       On November 2, 2005, FDI and Fairways Land conveyed the

Property to BRF by way of a special warranty deed.

¶ 9       On December 20, 2005, FDI, Fairways Land, and BRF

recorded a plat amendment stating that they were the owners of the

Property.  The only difference between the final plat and the plat

amendment was that the plat amendment listed FDI and Fairways

Land as the Property owners along with the record owner, BRF.

But FDI and Fairways Land had transferred their ownership

interest in the Property to BRF on November 2, 2005.

¶ 10      On January 24, 2006, Builders, as the declarant, recorded the

CCR.[1]  Builders did not own the Property — BRF did — yet the first

sentence of Section 1.1 stated that "Declarant owns those certain

_____

[1] Although the CCR is titled the "Amended and Restated Declaration
of Covenants, Conditions and Restrictions for Fairways at Buffalo
Run Homeowners Association, Inc.," nothing in the record shows
that any party identified a recorded declaration that was recorded
before this one.

parcels of land . . . more particularly described in Exhibit A . . . (the 'Real Property')." The property listed on Exhibit A was "The Fairways at Buffalo Run," which the parties agree covered the entirety of the Property.

¶ 11 Section 1.1 also stated that the declarant "wishe[d] to create a common interest community . . . for Fairways [a]t Buffalo Run Homeowners Association, Inc.," and that it would "develop the Property . . . as a Planned Community . . . in accordance with the terms and provisions of the Colorado Common Interest Ownership Act."

2. Construction Begins and Title Problems Continue

¶ 12 Development of the property began after Builders recorded the CCR. From June 2006 through December 2009, Builders constructed fifteen residential units situated in five buildings of three units each, on parcels of approximately 12,000 square feet. Before construction, BRF would convey the parcel to Builders. For parcels developed after December 1, 2006, when BRF conveyed its interest in the Property to FDI, FDI would convey the parcel to Builders.

¶ 13    The pattern established for development and construction of the five buildings was to (1) create a metes and bounds description of each parcel slated for construction; (2) in accordance with the CCR, on the completion of each parcel's development, complete and record a supplemental declaration; and (3) record a supplemental plat depicting the three constructed units.  Consistent with the CCR, through these actions the Developer Entities annexed each newly built unit into the community.

¶ 14    Builders sold the first unit on September 7, 2006.  After that sale, under the terms of the CCR, the HOA took sole responsibility for and paid all costs associated with the upkeep and maintenance of the entire Property.  FDI continued to own the undeveloped portions of the Property, however, so the Developer Entities paid the real property taxes assessed against those portions.

3.    Construction Pauses and the Development Deadline Expires

¶ 15    As required by section 38-33.3-205(1)(h), C.R.S. 2019, the CCR set a deadline for development activity.  In pertinent part, Article 6 of the CCR, titled "Declarant's Rights and Reservations," permitted the declarant to continue to develop the Property until

"the later of (i) the date which is seven (7) years following the recordation of this CCR or (ii) the date which is five (5) years following the recordation of the most recently recorded CCR[.]"  In essence, once two years had passed, the Developer Entities' development rights would not expire unless there was a gap of more than five years between construction projects.

¶ 16     That, however, is exactly what happened.  Construction stalled during the Great Recession, and on December 31, 2009, the Developer Entities recorded their most recent supplemental declaration, thereby starting the five-year clock on the development deadline.  By the time the Developer Entities were set to resume construction, the time limit had expired.  Thus, in January 2016, after FDI conveyed a sixth 12,000-square-foot parcel to Homes, and Homes attempted to develop that parcel, the HOA blocked it from entering the Property.

### B.     Procedural History

¶ 17     After being denied access to the Property for further development, the Developer Entities sued the HOA in August 2016.

7

Numerous counterclaims, third-party complaints, and cross-claims followed. In brief, the Developer Entities' complaint sought:

- a finding of private nuisance, an injunction ensuring access to the Property, and ejectment against the HOA;

- a declaratory judgment that FDI and Homes owned the undeveloped portion of the Property; and

- in the event that the request for declaratory judgment failed, the imposition of an equitable lien and recovery for unjust enrichment in the form of real property taxes paid for the Property by FDI.

¶ 18    Counterclaims by the HOA and the unit owners, who were all members of the HOA and appeared to be aligned, requested:

- a declaratory judgment seeking a determination of the ownership of the undeveloped portion of the Property by the HOA against FDI, Fairways Land, BRF, Homes, FDI's lenders, and the unit owners; and

- reformation of the CCR and other governing documents for the common interest community to cure the problems outlined above.

8

¶ 19    In a written order issued after a five-day bench trial, the trial court ruled that

- the entirety of the Property was encumbered by and subject to the provisions of the CCR;

- because the Developer Entities' development rights to the Property had expired, they could not develop the Property further except on terms, conditions, and limitations imposed by the HOA;

- the CCR should be reformed to add BRF, the Property owner when the CCR was recorded, as declarant; and

- the Property's roads were to be conveyed by FDI to the HOA.

¶ 20    The portion of the trial court's order conveying the roads to the HOA was entered together with a finding that the land beneath the units and surrounding the buildings, including the driveways and walkways leading up to the homes, was not properly designated on the supplemental plats as "General Common Elements" and "Limited Common Elements." The court concluded that, without such designations, the unit owners had no easement for the land

9

underneath and surrounding their units, effectively making them trespassers each time they entered or exited their homes. This created problems for the unit owners and ran counter to the CCR's intent.

## II.    Interpretation of the CCR

¶ 21    The Developer Entities argue that the undeveloped portions of the Property were never annexed into the common interest community and are therefore not subject to the CCR. Thus, they contend the trial court incorrectly interpreted the CCR. We disagree.

## A.    Preservation and Standard of Review

¶ 22    The parties agree that the Developer Entities' contentions were preserved.

¶ 23    We review de novo the interpretation of covenants and other recorded instruments. *Ryan Ranch Cmty. Ass'n v. Kelley*, 2016 CO 65, ¶ 24. "In doing so, we give words and phrases their common meanings and will enforce such documents as written if their meaning is clear." *Pulte Home Corp. v. Countryside Cmty. Ass'n*, 2016 CO 64, ¶ 23. Like contracts, we construe covenants and other recorded instruments "in [their] entirety . . . [,] seeking to harmonize

and to give effect to all provisions so that none will be rendered meaningless." *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984). To that end, we remain wary of "viewing clauses or phrases in isolation." *U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992). And where the terms are ambiguous, they must be strictly construed against the drafter. *Id.* at 211.

## B. Applicable Law

¶ 24 The Colorado Common Interest Ownership Act (CCIOA) establishes a uniform framework for the creation and operation of common interest communities. §§ 38-33.3-101 to -402, C.R.S. 2019. A "common interest community" is "real estate described in a declaration with respect to which a person, by virtue of such person's ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration." § 38-33.3-103(8), C.R.S. 2019. A common interest community is created "only by recording a declaration executed in the same manner as a deed . . . . No common interest community is created until the plat or map for the

11

common interest community is recorded." § 38-33.3-201(1), C.R.S. 2019.

¶ 25    A declaration is defined as "any recorded instruments however denominated, that create a common interest community." § 38-33.3-103(13). Declarations must contain, at a minimum, the components listed in section 38-33.3-205(1), one of which is a "legally sufficient description of the real estate included in the common interest community." § 38-33.3-205(1)(c); *see also* Douglas Scott MacGregor, *Colorado Community Association Law: Condominiums, Cooperatives, and Homeowners Associations* § 3.3, at 160 (2d ed. 2019).

<h2 style="text-align:center">C.    Discussion</h2>

¶ 26    The Developer Entities maintain that the CCR "is valid and has created a Community," but contend that Section 1.1 establishes that the undeveloped portions of the Property were not included in the community until they were affirmatively annexed. Thus, the Developer Entities argue, the vast majority of the Property is not subject to the CCR, including the time limit that it

established for development.[2]  As the Developer Entities' expert asserted, "[t]he project was formulated such that property would not be part of the Fairways Buffalo Run Common Interest Community until annexed into the Community."

¶ 27     The HOA disagrees, arguing instead that once the first unit was sold and contemporaneously annexed, the community included the Property in its entirety.  And because construction paused for more than five years, the HOA contends, the CCR's deadline for development expired before the Developer Entities attempted to begin building again.

¶ 28     The Developer Entities' argument relies primarily on Section 1.1 of the CCR, which states: "When annexed into the Common Interest Community pursuant to the terms herein, the Real Property, the Annexable Units, along with the Association Property shall be collectively referred to in this [CCR] as the 'Property.'"  The

---

[2] The parties did not dispute in the trial court that under the CCR, the development rights for whatever real property is subject to it had expired.  Although our holding that the entirety of the Property is subject to the CCR necessarily means that the development rights that have expired include those for the undeveloped portions of the Property, the parties do not dispute that those undeveloped portions are still owned by FDI.  *See* § 38-33.3-210(5), C.R.S. 2019.

Developer Entities argue that the phrase "when annexed" establishes that the CCR "contemplates the annexation of land into the Community over time," rather than designating the entire Property as the community all at once.

¶ 29     This argument, however, is undermined by Section 2.16 of the CCR, which defines "Common Interest Community" as "the Real Property which is described on Exhibit A attached hereto, the Units and the Buildings and all other real property which is made subject to the terms and provisions of this CCR," and Section 2.42, which defines "Property" as "the real property more particularly described on Exhibit A attached hereto."  Designated on Exhibit A, titled "Legal Description of Property," is "The Fairways at Buffalo Run" — i.e., all the real property at issue in this case.  In other words, Exhibit A, which delineates the boundaries of the community, states that the community, once created, includes the entire Property.

¶ 30     We are not persuaded that this interpretation renders meaningless the phrase "when annexed" in Section 1.1.  The sentence in which that phrase appears refers not only to "the Real

Property" (defined in Exhibit A as the entire Property), but also to "Annexable Units" and "the Association Property." Section 6.8, titled "Annexation of Additional Properties," establishes the procedures for annexation of buildings and units, which the Developer Entities followed in connection with the construction on each parcel. Yet that same section provides no mechanism for the annexation of land.

¶ 31    Instead, Section 6.8 provides that annexation of "Annexable Units" and "Annexable Buildings" requires the recording of a supplemental declaration and a supplemental plat. The supplemental declaration, "generally in the form attached [to the CCR] . . . as Exhibit D," appears as a model form with the stated purpose to "annex certain New Buildings and New Units into the [CCR] and to include certain New Buildings and New Units within the Common Interest Community, as defined in the [CCR]." Similarly, in the definitions section, "supplemental plat" is described as "any land survey plat . . . recorded . . . for the purpose of annexing the real property described thereon to the Common Interest Community." That definition is then refined in Section 6.8

to mean any plat or map that depicts "the Annexable Building and the Annexable Units therein to be annexed to the Common Interest Community." In short, these annexation procedures and recorded supplements address only the annexation of buildings and units — not land.

¶ 32    In light of these provisions, the procedures followed by the Developer Entities in connection with each construction project make sense. In contrast to the Property, which Exhibit A makes clear was included in the community at its inception, the Developer Entities were required to take affirmative action to incorporate subsequent construction — the buildings and units — into the community. That is precisely what they did when they prepared and recorded supplemental plats and supplemental declarations in connection with each parcel of three constructed units. But when the Developer Entities did so, by virtue of the CCR's prescription, they annexed only the buildings and units, and not the land

16

underlying those projects — an expected result if that land was already part of the community.[3]

¶ 33 Interpreting the CCR as encompassing the entire Property from the outset supports and harmonizes the remaining provisions of the CCR concerning annexation of buildings and units and helps ensure secure, marketable title to the unit owners, free from technical defects and "clerical errors."

¶ 34 In any event, even if the terms of Section 1.1 and the provisions above conflict, we resolve that conflict by interpreting those terms against the drafter, the Developer Entities. *See U.S. Fid. & Guar. Co.*, 842 P.2d at 213. Taking this approach also

---

[3] In contrast, if the land underneath and immediately surrounding each construction project had to be annexed in order to become part of the community, then the Developer Entities' failure to do so rendered the unit owners trespassers anytime they accessed their units. This is precisely the sort of absurd result that we strive to avoid. *See Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 793 (Colo. App. 2001) ("[A] contract should never be interpreted to yield an absurd result."), *abrogated on other grounds by Ingold v. AIMCO/Bluffs, L.L.C. Apartments*, 159 P.3d 116 (Colo. 2007); *see also* Douglas Scott MacGregor, *Colorado Community Association Law: Condominiums, Cooperatives, and Homeowners Associations* § 2.10, at 106 (2d ed. 2019).

generally[4] comports with the expectations and conduct of the parties over time. For example, Harding (the Developer Entities' principal), who ran the HOA for several years as the project got up and running, acknowledged that dues paid by the HOA members were not devoted only to those areas that the Developer Entities had affirmatively annexed. Instead, they went to maintenance of the "common area of the entire project." In another instance, Harding, acting on behalf of the Developer Entities-controlled HOA, executed an easement and maintenance agreement stating that the HOA owned "the roads, walkways, open space, and other common areas" shown on the December 20, 2005, plat amendment.

---

[4] We acknowledge the Developer Entities paid property taxes on the undeveloped portions of the Property. When weighing those payments against the parties' conduct and the trial court's conclusion that FDI owns the undeveloped portions of the Property, however, the court must only have concluded that the Developer Entities' assumption of that tax burden was not dispositive. We will not substitute our judgment for that of the trial court. Accordingly, we do not disturb its consideration and resolution of the conflicting evidence presented on this point. *See Rocky Mountain Metro. Recreation Dist. v. Hix,* 136 Colo. 316, 319, 316 P.2d 1041, 1043 (1957).

¶ 35    Because they are distinguishable, we likewise find unconvincing the Developer Entities' reliance on *Pulte* and *Ryan Ranch*, which they contend compel the conclusion that the undeveloped portions of the Property remained outside the common interest community until annexed, and thus were not subject to the CCR.  In *Pulte*, the developer, Pulte Home Corporation, sought to develop a residential common interest community on land that it did not own but that it had an option to purchase.  *Pulte*, ¶ 6.  The declaration prepared and recorded by Pulte defined the "community" created by the declaration as the "real property described on Exhibit A or which becomes subject to [the declaration]."  *Id.* at ¶ 7.  Exhibit A to the declaration, however, listed no real property.  Rather, it stated "NONE AT THE TIME OF RECORDING THIS [DECLARATION]."  *Id.* at ¶ 29.  Exhibit D to the declaration "contain[ed] a metes and bounds description of 'Annexable Property,'" and other parts of the declaration outlined procedures by which Pulte could annex and incorporate it into the community.  *Id.* at ¶ 8.  Under these circumstances, the supreme court held that the undeveloped portions of Pulte's property were

19

incorporated into the community only after they were formally annexed (thereby making the developer responsible for monetary assessments). *Id.* at ¶ 37.

¶ 36     The declaration in *Ryan Ranch*, ¶ 10, worked the same general way. It "defined the 'Community' as 'real property described in Exhibit A . . . or which becomes subject to'" the declaration. *Id.* In contrast to the Exhibit A in *Pulte*, however, *Ryan Ranch*'s Exhibit A identified some real property while excluding the land that was at issue in the lawsuit — the parcel that the plaintiff community argued was subject to the declaration and therefore encumbered with assessments imposed by the homeowners association. *Id.* As in *Pulte*, Exhibit D in *Ryan Ranch* included a "metes and bounds description" of annexable property. *Id.* at ¶ 11.

¶ 37     The Developer Entities assert that because they used the "same development scheme" as the developers in *Pulte* and *Ryan Ranch*, this case is "materially indistinguishable" from the precedent set by those cases. But this argument overlooks the critical difference in the exhibits that the developers in *Pulte*, *Ryan Ranch*, and this case attached to their respective declarations. In

20

each case, Exhibit A described the extent of the community at its inception. As we have already noted, in *Pulte* that description included no land at all. Put another way, when it was recorded, the developer's declaration attached no obligations to any real property. In *Ryan Ranch*, the Exhibit A identified some real property, but not the parcel that prompted the lawsuit. In contrast, in this case, Exhibit A identified *the entire Property* as belonging to the community from the beginning.[5]

¶ 38   Exhibit D to the declarations in *Pulte* and *Ryan Ranch* was likewise a virtual mirror image of Exhibit D to the CCR in this case.

---

[5] While the issue of *when* the common interest community was formed is not decisive here as it was in *Pulte*, we note the trial court's finding that it "[came] into existence" when the first unit was sold. None of the parties challenge that finding. And because we conclude and the parties do not dispute that the community was formed in accordance with CCIOA's section 38-33.3-201, C.R.S. 2019, the precise moment when that occurred is not of consequence to our determination that the CCR encumbered all of the Property described in Exhibit A. Nevertheless, we agree with the trial court that the common interest community was created when the first unit was sold. The sale subordinated that unit to the CCR and obligated its owner "to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration." § 38-33.3-103(8), C.R.S. 2019; *see also Pulte Home Corp. v. Countryside Cmty. Ass'n*, 2016 CO 64, ¶¶ 44, 48.

21

*Pulte* and *Ryan Ranch* precisely described annexable real property, and the declarations in those cases "outline[d] procedures by which the property described in Exhibit D could be subjected to the [declaration's] terms and incorporated into the community." *Pulte,* ¶ 8; *see also Ryan Ranch,* ¶ 11. But in this case, Exhibit D (which served the same purpose) contained no metes and bounds description of annexable real property. It was left blank except for reference to an attached model supplemental declaration form. And the CCR itself did not outline any procedures for annexing any additional real property into the community.

¶ 39     Put simply, in *Pulte* and *Ryan Ranch,* the declarations excluded either all or some of the property under development from the community until the developer specifically annexed it. Here, by listing the entire Property on Exhibit A, the CCR did just the opposite. We therefore conclude that *Pulte* and *Ryan Ranch* are not controlling in this case and, as a result, we agree with the trial court's finding that the entirety of the Property was encumbered by the CCR at the time the community was formed. *See Buick v. Highland Meadow Estates at Castle Peak Ranch, Inc.,* 21 P.3d 860,

862 (Colo. 2011) ("[We] will enforce a covenant as written that is clear on its face.").[6]

¶ 40     We also conclude, as stated above, that this result comports with CCIOA's requirements for the creation of a common interest community.  Here, the CCR set forth the HOA members' "obligation to pay for various expenses associated with common property," and it "attach[ed] that obligation to individually owned property."  *Pulte*, ¶ 44.  By its terms, therefore, the CCR encumbered the real property listed in Exhibit A, i.e., the entire Property, including both the developed and undeveloped portions, and the Developer Entities' implementation of the CCR does not suggest otherwise.  *Cf. id.* at ¶¶ 70-71 (Coats, J., concurring in part and concurring in the judgment).

---

[6] We note that this conclusion also renders the entirety of the Property — other than the units — "Common Elements," defined in part in Sections 2.14 and 1.4(b) of the CCR as "all of the Common Interest Community" including "all of the land, landscaping, driveways, sidewalks, walkways, parking areas, and easements which are a part of the Common Interest Community."  This therefore resolves the concern that the unit owners commit trespass each time they access their units.

### III. Reformation of the CCR

¶ 41    The Developer Entities contend that the trial court "was not empowered" to reform the CCR by adding BRF as a signatory. Because our interpretation of the CCR resolves any concerns created by the discrepancies between the statements in the CCR and the actual chain of title, we hold reformation was unnecessary.

#### A. Preservation and Standard of Review

¶ 42    The parties agree that the Developer Entities' contentions were preserved.

¶ 43    Whether the district court has applied the correct legal standard in determining the *availability* of a particular equitable remedy is reviewed de novo. *See Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo. App. 2008). But the power to determine the *components* of such a remedy is within the court's discretion. *Beren v. Beren*, 2015 CO 29, ¶ 12.

¶ 44    To justify reformation, there must be clear and unequivocal evidence showing that it is the appropriate remedy under the circumstances. *Md. Cas. Co. v. Buckeye Gas Prods. Co.*, 797 P.2d 11 (Colo. 1990). If the evidence meets this standard of proof,

24

reformation may, and should be, ordered. *Hooper v. Capitol Life Ins. Co.*, 92 Colo. 376, 20 P.2d 1011 (1933). CCIOA directs courts to administer remedies "liberally," § 38-33.3-114(1), C.R.S. 2019, and permits them to apply the principles of both law and equity to achieve a just and conscionable result. §§ 38-33.3-108, -112(1), C.R.S. 2019; *see also Arrabelle at Vail Square Residential Condo. Ass'n v. Arrabelle at Vail Square LLC*, 2016 COA 123, ¶¶ 55-56.

¶ 45    Because the Developer Entities challenge the propriety of reformation as the appropriate equitable remedy for Builders' incorrect representation that it was the owner of the Property when it executed the CCR, we review de novo the trial court's determination that reformation was necessary.

## B.    Discussion

¶ 46    The Developer Entities argue that equity may not be employed to cure defects in a declaration so as to conform with the parties' intent. They also contend the trial court's premise for reformation

— that the CCR was a "wild deed" — was erroneous. We need only reach the first of these contentions.[7]

¶ 47     As we have already noted, Section 1.1 of the CCR affirmatively stated that Builders, the declarant, owned the Property, despite the fact that BRF did. This discrepancy and BRF's absence from the CCR's signature line, the trial court found, "created a significant title problem," which required a remedy to comport with Colorado's declared policy regarding titles:

> It is the purpose and intention of this article . . . to render titles to real property and every interest therein more secure and marketable, and it is declared to be the policy in this state that this article . . . shall be liberally construed with the end in view of rendering such titles absolute and free from technical defects so that subsequent purchasers and encumbrancers by way of mortgage, judgment, or otherwise may rely on the record title . . . so that the record title of the party in possession is sustained and not defeated by technical or strict constructions.

---

[7] The Developer Entities also argue that "it was error for the [court] to use 'equity' to 'fix' the [CCR] to make it encumber all of the Property." As we discussed in Part II.C, however, the CCR, by its own terms, "encumbers all of the Property." Accurate interpretation of the CCR renders it unnecessary to reform the CCR to reflect the intent of the parties.

§ 38-34-101, C.R.S. 2019.

¶ 48    An insubstantial failure of a declaration to comply with CCIOA, however, does not render title unmarketable or otherwise affect it.  § 38-33.3-203(1), C.R.S. 2019.  Given our conclusion that the CCR's Exhibit A encumbers the entire Property, along with the parties' general historical compliance with the CCR's requirements, we conclude that the inaccuracy in Section 1.1 of the CCR amounts to an insubstantial failure, and thus does not affect the marketability and security of the titles of the individual unit owners or the Property as a whole.  This result aligns with our determination that the community was created when the first unit was sold, by which time the inaccuracies in the final plat had been remedied by recording the plat amendment, along with the CCIOA-compliant CCR.  Nor does BRF's absence from the signature line of the CCR affect the access rights of individual unit owners.  Indeed, once the CCR is properly understood as encumbering the entirety of the Property, that makes the land underneath and surrounding individual units "Common Elements."  And this dispels any concern that a unit owner would be trespassing by stepping outside the

27

house because, under Section 4.1 of the CCR, "all Members may use Common Elements."

¶ 49    Because the trial court's interpretation of the CCR obviated the need for an equitable remedy, the trial court erred by acting in equity and adding BRF to the signature line of the CCR.  *See Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1193 (Colo. 2010) (holding that court should not resort to equity when there is a plain, speedy, and adequate remedy at law); *In re Marriage of Hall*, 971 P.2d 677, 679 (Colo. App. 1998) ("Equitable relief is available only when the law affords none.").  This error, however, was harmless because it did not affect the substantial rights of the parties.  *See* C.A.R. 35(c); *see Laura A. Newman, LLC v. Roberts*, 2016 CO 9, ¶ 24 ("[A]n error affects a substantial right only if 'it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" (quoting *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010))) (emphasis omitted).

¶ 50    Accordingly, because the trial court's accurate interpretation of the CCR resolved any concerns created by the absence of BRF's

signature, reformation of the CCR was unnecessary, but a harmless error.[8]

## IV. Conveyance of the Roads to the HOA

¶ 51 Next, the Developer Entities argue that the trial court erred by ordering FDI to convey the Property's roads to the HOA. Specifically, they contend that the Property's roads are public roads under the CCR. We disagree.

### A. Preservation and Standard of Review

¶ 52 The parties agree, as do we, that the Developer Entities preserved this argument. Again, we review the interpretation of covenants and other recorded instruments de novo. *Ryan Ranch,* ¶ 24.

### B. Discussion

¶ 53 The Developer Entities contend that the Property's roads "are to be owned by FDI and dedicated to the public for use," and that the CCR granted the HOA an easement over the roads. To support

---

[8] We acknowledge the trial court resolved other issues through reformation that are not contested on appeal. While we hold that adding BRF as signatory to the CCR was unnecessary, we do not question the court's use of reformation to remedy those separate issues.

their argument, the Developer Entities point to a dedication on the final plat recorded October 31, 2005, which contains language granting Commerce City easements for public use. On the second page of the plat, the roads within the subdivision are depicted, and at least one of the roads is labeled a "Public Access Easement."

¶ 54    To create public rights in a road, however, the governing body must accept the dedication. § 43-2-201(1)(a), C.R.S. 2019; *see also Burlington & C. R. Co. v. Schweikart*, 10 Colo. 178, 14 P. 329 (1887). The Developer Entities identify no evidence in the record, nor could we locate any, that Commerce City was ever offered or accepted this public dedication. Accordingly, no public right was created in the Property's roads.[9]

¶ 55    Article 5 of the CCR, titled "Easements," describes the easements that are "General Common Elements," and it does not change this analysis. Section 5.1(a) and (b) reference easements for the purpose of gaining access between the units or buildings and the "public streets adjoining the Property."

---

[9] As a practical matter, the Property is a gated development, which casts doubt on the extent to which the public could access its roads at all.

30

¶ 56    Section 2.14 of the CCR, on the other hand, defines "Common Elements" as "all of the Common Interest Community except the portions thereof which constitute Units." Excepting only the units, this definition necessarily includes the roads. Accordingly, because the Property's roads are not public roads and the CCR designated them as "Common Elements" in the common interest community, the trial court did not err in conveying the roads to the HOA.

## V.    Attorney Fees

¶ 57    The Developer Entities request attorney fees pursuant to section 38-33.3-123(1)(c), C.R.S. 2019, which provides that "[i]n any civil action to enforce or defend the provisions of this article or of the declaration, bylaws, articles, or rules and regulations, the court shall award reasonable attorney fees, costs, and costs of collection to the prevailing party."[10] Thus, "a prevailing party in a CCIOA dispute is entitled to attorney fees." *Perfect Place v. Semler*, 2016 COA 152M, ¶ 80, *rev'd on other grounds*, 2018 CO 74.

---

[10] The unit owners oppose awarding the Developer Entities attorney fees; they do not request their own attorney fees.

31

¶ 58     The HOA requests attorney fees and costs under the same

provision, as well as costs under C.A.R. 39.

¶ 59     Section 38-33.3-123(1)(c) mandates an attorney fees award "to

the prevailing party."  CCIOA does not define "prevailing party."

Under Colorado law,

> [t]o be a prevailing party for the purpose of an
> award of attorney fees pursuant to a statute or
> contract, the applicant must have succeeded
> upon a significant issue presented by the
> litigation and must have achieved some of the
> benefits that he sought in the lawsuit.  But a
> party need not prevail upon the "central" issue,
> only upon a significant one.

*In re Marriage of Sanchez-Vigil*, 151 P.3d 621, 625 (Colo. App. 2006)

(quoting *In re Marriage of Watters*, 782 P.2d 1220, 1221 (Colo. App.

1989)).

¶ 60     The Developer Entities argued that the trial court erred in its

interpretation of the CCR, but we hold otherwise.  And while the

trial court erred in reforming the CCR, we hold the error was

harmless.  Additionally, we affirmed the trial court's order that FDI

convey the Property's roads to the HOA.  Accordingly, the HOA is

the prevailing party under CCIOA, and the case is remanded to the

trial court to determine and award to the HOA its reasonable attorney fees and costs.

¶ 61   As for the HOA's request for costs under both 38-33.3-123(1)(c) and C.A.R. 39, having concluded that the HOA prevailed on the significant claim against it, the remand must afford the trial court an opportunity to exercise its discretion as to awarding the HOA its costs. *See Coldwell Banker Commercial Grp., Inc. v. Hegge*, 770 P.2d 1297, 1300 (Colo. App. 1988).

## VI.   Conclusion

¶ 62   The judgment is affirmed. On remand, the trial court must determine the amount of the HOA's reasonable attorney fees, and award that amount to it against the Developer Entities. The court shall also, in its discretion, address the HOA's request for costs.

JUDGE TAUBMAN and JUDGE HAWTHORNE concur.