24CA2028 Ellis v Hillcrest 02-26-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA2028
La Plata County District Court No. 23CV30144
Honorable Kim S. Shropshire, Judge

Larry Ellis and Nancy Ellis,

Plaintiffs-Appellants,

v.

Hillcrest Greens Homeowners Association, Inc., a Colorado nonprofit
corporation,

Defendant-Appellee.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE HAWTHORNE*
Dunn and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 26, 2026

Law Office of John C. Seibert, LLC, John Seibert, Durango, Colorado, for
Plaintiffs-Appellants

Golden & Landeryou, LLC, Kenneth S. Golden, Durango, Colorado, for
Defendant-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     In this declaratory judgment action, plaintiffs, Larry and Nancy Ellis, appeal the district court's order awarding summary judgment to defendant, Hillcrest Greens Homeowners Association, Inc. (HOA).  We affirm the judgment.

## I.     Background

¶ 2     The Ellises own property in Hillcrest Greens, a subdivision near Durango, Colorado, which is governed by the "Second Amended and Restated Covenants, Conditions and Restrictions of the Hillcrest Greens Homeowners Association" (the Covenants).

¶ 3     The Covenants set forth standards for constructing residences and using lots in the subdivision "for the purpose of enhancing and protecting [the subdivision's] value and desirability."  To enforce these standards, the Covenants also establish an Architectural Review Committee (ARC) that is responsible for reviewing and approving proposed property improvements or modifications.

¶ 4     On February 6, 2022, the Ellises emailed the ARC expressing their desire to build a detached garage on their property (February submission).  The email contained only a site plat showing the garage's proposed location and a three-dimensional rendering

created by the Ellises. The email also clarified that the garage's exterior would conform with the exterior of the Ellises' home.

¶ 5 On March 7, 2022, after a brief email exchange, the ARC denied the request because under the Covenants "it is prohibited to construct a garage or carport that is not attached and enclosed." About two weeks later, the HOA met, reviewed the ARC's decision, and found it to be correct. Later, the HOA informed the Ellises that their February submission was incomplete because it was missing documentation required by the Covenants.

¶ 6 In August 2023, the Ellises submitted a "more complete" application to the ARC to build the proposed detached garage (August application). The ARC responded that it considered a detached garage to be a "storage building" that could not, under the Covenants, exceed 100 square feet. Because the proposed detached garage exceeded that limit, the ARC denied the August application.

¶ 7 The Ellises then initiated this lawsuit seeking declaratory and injunctive relief.

¶ 8 In their claim, the Ellises requested the district court to find that (1) their February submission must be "deemed approved" because the ARC did not approve or deny it within twenty days from

submittal, and (2) their August application must be approved because the Covenants do not preclude construction of an additional detached garage within the subdivision. The HOA counterclaimed, asking the court to find that the Covenants prohibit building an additional detached garage on property within the subdivision.

¶ 9 Both parties filed motions for summary judgment. The district court granted the HOA's motion and denied the Ellises' motion.

¶ 10 The court found that the February submission plans were incomplete and rejected the Ellises' argument that the HOA had presumptively approved the February submission by failing to take definitive action within twenty days. The court also concluded that (1) the Covenants do not permit subdivision property owners to construct detached garages; (2) the Covenants allow only for an attached, two-car garage and one small storage building — which would include a detached garage — of 100 square feet or less on any given subdivision lot; and (3) the HOA's denial of the August application did not violate the Covenants or the Colorado Common Interest Ownership Act (CCIOA).

## II.    Analysis

¶ 11    The Ellises contend that the district court erred by concluding that their February submission was not "deemed approved" and by interpreting the Covenants "in favor of [a] restriction" on their proposed detached garage to uphold the HOA's denial of the August application.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 12    A court may grant summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  *Mitton v. Danimaxx of Colo., Inc.*, 2023 COA 18, ¶ 9 (citing C.R.C.P. 56(c)).  We review a district court's decision granting summary judgment de novo.  *Griswold v. Nat'l Fed'n of Indep. Bus.*, 2019 CO 79, ¶ 22.

¶ 13    Under CCIOA, "[d]ecisions concerning the approval or denial of a unit owner's application for architectural or landscaping changes shall be made in accordance with standards and procedures set forth in the [covenants]."  § 38-33.3-302(3)(b), C.R.S. 2025.  We review a district court's interpretation of covenants and other recorded documents de novo.  *Ryan Ranch Cmty. Ass'n v. Kelley*, 2016 CO 65, ¶ 24.

¶ 14    We interpret a covenant according to the language's plain and ordinary meaning, and "[i]f the covenant is clear on its face, [we] will enforce it as written." *K9Shrink, LLC v. Ridgewood Meadows Water & Homeowners Ass'n*, 278 P.3d 372, 377 (Colo. App. 2011). We construe a covenant as a whole, "seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Pulte Home Corp. v. Countryside Cmty. Ass'n*, 2016 CO 64, ¶ 23 (citation omitted).

¶ 15    "Only when the language of a covenant is unclear will the court resort to rules of interpretation," *K9Shrink*, 278 P.3d at 377, and in that case, "courts resolve all doubts against the restriction and in favor of free and unrestricted use of property." *Buick v. Highland Meadow Ests. at Castle Peak Ranch, Inc.*, 21 P.3d 860, 862 (Colo. 2001).

## B.    The February Submission

¶ 16    The Ellises contend that under the Covenants, "[t]he deadline for approving or disapproving the [February submission] was February 26, 2022." They argue that the ARC did not respond to the February submission by that date, and the February submission "must, as a matter of law, be deemed approved" as of

that date.  The HOA responds that the Ellises misconstrue the relevant provisions of the Covenants, which establish that the twenty-day presumptive approval period begins to run only after the ARC receives an application containing "all required information." The district court agreed with the HOA, and we discern no error in that ruling.

¶ 17     Article VI of the Covenants, titled "Architectural Control," establishes the ARC and provides its review process and parameters for project approval.  Section 6.3 provides,

> No improvements shall be constructed, erected, placed, altered, maintained or permitted on any lot . . . until plans and specifications with respect thereto in manner and form satisfactory to the [ARC] have been submitted to and approved in writing by the [ARC].  *These plans and specifications shall show the proposed improvements, site location of such improvements, complete building plans and material specification and all exterior elevations, materials and colors, landscaping, grading, drainage, erosion control, easements and utilities, and such other information as may [be] requested by said [ARC].*
>
> . . . .
>
> All such materials shall be submitted in writing over the signature of the owner of the lot or the owner's authorized agent.

6

(Emphasis added.)

¶ 18    Section 6.11 provides,

> If the [ARC] fails either to approve or disapprove such plans and specifications (including resubmission of disapproved plans and specifications) within twenty (20) days after the plans have been submitted to it (*provided that all required information has been submitted*), it shall be conclusively presumed that said plans and specifications have been approved, subject, however, to the restrictions contained [i]n Article VII hereof.  The [ARC] shall notify the owner in writing upon receipt of *any required plans and specifications* and the aforesaid twenty (20) day period shall commence on the date of such notification.

(Emphasis added.)

¶ 19    Section 6.11 specifically states that the twenty-day presumptive approval period is conditioned on "all required information [having] been submitted."  And section 6.3 establishes information that "shall be submitted in writing," specifying that plans "shall show the proposed improvements, site location of such improvements, complete building plans and material specification and all exterior elevations, materials and colors, landscaping, grading, drainage, erosion control, easements and utilities."

7

¶ 20    The Ellises argue that section 6.11's parenthetical language conditioning the presumptive approval period on submitting "all required information" is not controlling.  Rather, they submit that the phrase requiring the ARC to "notify the owner in writing upon receipt of *any* required plans and specifications" triggers the twenty-day period when the owner "provide[s] at least some of the plans required under [s]ection 6.3."

¶ 21    Reading section 6.3 as the Ellises propose is inconsistent with the Covenants' plain language, read as a whole.  *See Allen v. Reed*, 155 P.3d 443, 445 (Colo. App. 2006) ("[W]e construe covenants as a whole, keeping in mind their underlying purpose." (citation omitted)).  Section 6.3 establishes that "plans and specifications" must be submitted to and approved by the ARC and that these "plans and specifications shall show" certain required information.  So the phrase "plans and specifications" in section 6.11, including the "any required plans and specifications" language highlighted by the Ellises, must be construed with section 6.3 as referring to "any required plans and specifications" that include "all required information."  *See Pulte*, ¶ 23 (we seek "to harmonize and to give effect to all provisions [of a covenant]" (citation omitted)).  The

controlling language in section 6.11 is not the word "any"; instead it is the phrases "plans and specifications" and "(provided that all required information has been submitted)."

¶ 22    The district court found, based on undisputed facts, that the February submission did not contain all information required by section 6.3. It therefore concluded that the twenty-day presumptive approval period was not triggered, and the February submission was not presumed to be approved. Given the Covenants' clear language and the undisputed facts, we conclude that the district court did not err.

## C.    August Application

¶ 23    The Ellises next contend that the district court erred by concluding that their August application did not comply with the Covenants. We are not persuaded.

### 1.    Additional Facts

¶ 24    Covenants section 6.9 provides that "[n]o plan for improvements shall be approved and no residences shall be constructed on any lot within [the subdivision] unless plans contain provision for *an attached, enclosed garage or carport* with a

minimum of space reasonably housing two (2) standard sized motor vehicles." (Emphasis added.)

¶ 25 Section 6.10 provides that "*[o]ne storage building per lot of not more than 100 square feet shall be allowed*, provided that the storage building is permanently affixed to a cement slab or block foundation and is not more than 12 feet in height from ground level to the peak on the roof." (Emphasis added.)

¶ 26 The Covenants neither expressly prohibit nor expressly allow detached garages.

¶ 27 In their motion for summary judgment, the Ellises argued that because the Covenants do not explicitly prohibit detached garages, the HOA violated the Covenants by denying their application to construct one. The HOA argued in its motion that because a detached garage is a "storage building," the Covenants do not allow subdivision property owners to construct detached garages exceeding 100 square feet.

¶ 28 The district court rejected the Ellises' argument, agreeing with the HOA that a detached garage is a type of "storage building" because a garage "is commonly understood as a building or space used to store vehicles when they are not in use." It also concluded

that the Covenants' intent, read as a whole, is "to maintain a neighborhood that include[s] only single-family homes of a certain size and height, each having an attached garage, and one . . . storage building," which would include a detached garage, that "is limited to 100 square feet or less."

¶ 29    The court entered summary judgment for the HOA, concluding that

> 2. The Covenants do not permit construction of a detached garage on a lot within [the subdivision], as the Covenants only allow for a home with attached garage (§ 6.9) and a storage building of 100 square feet or less (§ 6.10) to be constructed on any [subdivision] lot.
>
> 3. The HOA's denial of [the Ellises'] August Application did not violate the terms of the Covenants . . . .
>
> 4. The HOA is not required to approve and allow construction of a detached garage in conformance with [the Ellises'] August Application.

## 2.    Discussion

¶ 30    The Ellises contend that the Covenants' plain language "does not limit or restrict the number and types of structures that may be maintained on a lot," that the district court "essentially added a term or restriction" to the Covenants by concluding that a detached

11

garage is a "storage building," and that their August application complies with the Covenants and must be approved. We disagree.

¶ 31 The Ellises argue that section 6.9, which requires each residence in the subdivision to have an attached, two-car garage, does not *prohibit* detached garages; instead, "it merely requires that each lot have, at minimum, an enclosed garage or carport large enough to house two standard sized vehicles." Granted, neither the permissive language of section 6.9 nor the Covenants as a whole contain a broad prohibition of "detached garages." *See Dunne v. Shenandoah Homeowners Ass'n*, 12 P.3d 340, 345 (Colo. App. 2000) (provision of a restrictive covenant describing animals that could be maintained on a lot did not act as a restriction against unlisted animals). But the Covenants specifically limit additional buildings to "[o]ne storage building per lot of not more than 100 square feet" under section 6.10.

¶ 32 The Ellises argue that section 6.10 "does not limit the number or size of any accessory buildings or structures to one building of no more than 100 sq. ft," but instead it only "limits the number of storage buildings allowed on each lot." We disagree for two reasons.

¶ 33    First, as the district court noted, the Ellises' interpretation would mean that the Covenants, which include size restrictions for both residences (in section 6.7) and storage buildings (in section 6.10), allow other accessory buildings of any size. Such a reading cannot be squared with the Covenants, read as a whole. *See Pulte*, ¶ 23.

¶ 34    Second, we agree with the district court that applying the Covenants in this manner would allow lot owners to evade the storage building size requirement in section 6.10 simply by calling their proposed building something else, thus rendering section 6.10 meaningless. *See FD Ints., LLC v. Fairways at Buffalo Run Homeowners Ass'n*, 2019 COA 148, ¶ 23 (in reviewing covenants, we seek to ensure that no provisions are rendered meaningless).

¶ 35    The Ellises' citations to the Covenants' other provisions do not persuade us otherwise. The use of the term "garage" rather than "attached garage" or "storage building" in other provisions does not change our analysis that, read as a whole, the Covenants evince an intent to allow only those latter two types of buildings. And references to the "principal residence" or "principal dwelling" in other provisions cannot be understood to allow multiple dwellings

given that section 7.1 prohibits that scenario. Also, listed restrictions for other specific types of buildings do not indicate that accessory structures, broadly, are allowed.

¶ 36 We therefore reject the Ellises' argument that the Covenants do not limit or restrict the number and types of structures that may be maintained on a lot in the subdivision.

¶ 37 The Ellises also argue that the court "essentially added a term or restriction" to the Covenants by concluding that a detached garage is a "storage building" within the meaning of section 6.10. Again, we disagree.

¶ 38 Although the Covenants do not define the terms "storage building" or "garage," the "plain and ordinary meaning" of those terms includes a detached garage. *See K9Shrink, LLC*, 278 P.3d at 377. A storage building is a building in which items are stored. To "store" something is "to place or leave [it] in a location . . . for preservation or later use or disposal." Merriam-Webster Dictionary, https://perma.cc/HQH6-KACZ. And a "garage" is a "shelter . . . for automotive vehicles," Merriam-Webster Dictionary, https://perma.cc/2DVD-X235, or in other words, a "location" in which automotive vehicles are "place[d] or le[ft] . . . for preservation

14

or later use or disposal." Merriam-Webster Dictionary, https://perma.cc/HQH6-KACZ.

¶ 39 The court neither "added a term or restriction" to the Covenants nor "acknowledged [that the term storage building] in [s]ection 6.10 is reasonably susceptible to more than one meaning" by concluding that a detached garage is a storage building subject to the Covenants' storage building provisions. We perceive no error.

¶ 40 Finally, considering our conclusions above, we reject the Ellises' contention that their August application complies with the Covenants and must be approved. The undisputed evidence before the court shows that the proposed "detached garage" exceeds 100 square feet and therefore the application was properly denied.

### III. Appellate Attorney Fees

¶ 41 The Ellises and the HOA request their appellate attorney fees under C.A.R. 39.1, section 38-33.3-123(1)(b), C.R.S. 2025, and the Covenants' section 8.2. Because the HOA has prevailed on appeal, it is entitled to such an award under the Covenants and C.A.R. 39.1. The district court is uniquely suited to undertake the factfinding necessary to determine such an award. So we exercise our discretion under C.A.R. 39.1 and remand the case to the

15

district court to determine and award the HOA its reasonable appellate attorney fees and costs.

## IV.   Disposition

¶ 42    The judgment is affirmed, and the case is remanded to the district court to determine and award the HOA its reasonable attorney fees and costs.

JUDGE DUNN and JUDGE MOULTRIE concur.